**LIBERTY MUTUAL INSURANCE COMPANY et al.**

v.

**Robert J. JANES, in his capacity as Director of the Department of Business Regulation et al.**

No. 89–246–M.P.

Supreme Court of Rhode Island.

Feb. 4, 1991.

Deming E. Sherman, Edwards & Angell, Providence, for plaintiffs.

William C. Maaia, East Providence and Mario R. Forte, Providence, for defendants.

## OPINION

WEISBERGER, Justice.

This case comes before us on a petition for certiorari filed by Liberty Mutual Insurance Company and Liberty Mutual Fire Insurance Company (Liberty), seeking review of a judgment entered in the Superior Court affirming a decision by the director of the Department of Business Regulation (director) authorizing a rate increase of 10 percent in workers' compensation insurance rates rather than a 22.5 percent increase as requested by Liberty. We reverse the judgment and remand with di-

rections. The facts of the case insofar as pertinent to this petition for certiorari are as follows.

Liberty filed a request for an increase in workers' compensation and employer's liability insurance averaging 22.5 percent on June 13, 1986. The requested rate increase was based in part upon a previous increase of 22.5 percent awarded by the director on November 15, 1985, to a number of Rhode Island workers' compensation and employer's liability carriers that underwrite less than 1 percent of such business in this state. These carriers filed a combined application through a license-rating organization known as the National Council on Compensation Insurance (NCCI). The NCCI companies included in their filing an increment for losses incurred in respect to risks assigned to these companies through the assigned-risk plan. This plan requires insurance carriers to accept coverage of certain employers who are unable to obtain workers' compensation insurance through the voluntary market for a variety of reasons including but not limited to poor loss experience.

Liberty was not privileged to participate in the NCCI filing since it underwrites more than 1 percent of the workers' compensation and employer's liability market in Rhode Island. Therefore, pursuant to G.L. 1956 (1989 Reenactment) chapter 7.1 of title 27 et. seq. and § 27–9–8, Liberty was required to submit an individual filing. However, its request for a 22.5 percent increase was based in large measure upon the increase accorded to the NCCI companies, even though Liberty claimed in its filing a need for a greater increase in the amount of 64.5 percent. However, competitive considerations limited the request to 22.5 percent.

In support of its petition for certiorari, Liberty raises a number of both procedural and substantive issues. We believe that the issue raised concerning the director's refusal to include a 24 percent residual-load factor in determining the rate allowed to Liberty is dispositive of this petition. Therefore, the additional issues raised by Liberty need not be considered.

The director in his decision rejected the request for a 22.5 percent increase and awarded a 10 percent increase, relying upon the testimony of a witness presented by the Attorney General, an actuary named James Stergiou. Apparently the director found Stergiou's testimony more credible than the testimony presented by Roy Morrell, a vice president and actuary employed by Liberty. The director found the testimony of Zvi Benderly, an economist presented by Liberty, totally lacking in probative force. Consequently our analysis of the correctness of the director's decision must be based upon the witness whom he found to be credible, Mr. Stergiou. This mode of analysis is required, since this court, like the Superior Court, is not privileged to assess the credibility of witnesses and may not substitute its judgment for that of the director concerning the weight of the evidence on questions of fact. G.L. 1956 (1988 Reenactment) § § 42–35–15(g), 42–35–16. *See, Berberian v. Dept. of Employment Security,* 414 A.2d 480 (R.I. 1980); *Prospecting Unlimited, Inc. v. Norberg,* 119 R.I. 116, 376 A.2d 702 (1977). Consequently this court must sustain the judgment of the Superior Court and the decision of the director unless it finds that the decision was clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record. Section 42–35–15(g)(5). Utilizing this standard, we review Stergiou's testimony upon which the director relied. That testimony in its most critical portion relating to the rate increase was as follows:

> "We throw everything in, and the rate change that I would recommend *prior to the consideration of the residual market charge, if that's allowed,* is around 10%. That's what I would recommend based upon a calculation of all these data here. And that summarizes my testimony." (Emphasis added.)

It should be noted that Morrell on behalf of Liberty had testified that there was a residual market deficit of 24 percent as a result of Liberty's participation in the assigned-risk pool. This was referred to by actuary Morrell as the "residual market

loading factor." This somewhat arcane phrase simply refers to the losses incurred by Liberty as a result of its participation in the assigned-risk pool of employers who had unfavorable loss experience or who for various reasons could not obtain insurance in the voluntary market.

In his testimony Stergiou did not question this 24 percent figure but as set forth by the director in his decision, Stergiou "did not include a residual market loading in his calculation of a rate indication for Liberty, and in response to questioning he said he did not feel that such a load is appropriate *unless participation in the residual market plan is mandatory,* and then only subject to certain conditions and with proper examination of the data and methodologies for determining such costs." (Emphasis added.)

Although Liberty had presented data in its filing that established a 24 percent residual-market-load factor, neither Stergiou nor the director challenged the data, save to indicate that there might be a difference between incurred and paid losses. However, no specific disagreement with the data was set forth by Stergiou or by the director. In his decision, however, the director declined to include a residual-market-load factor in the rate calculations for Liberty. Somewhat surprisingly, the director suggested that this factor should be considered on an all-industry basis either as part of a hearing on the NCCI residual market filing or in a separate proceeding.

■ The director did not find that participation in the assigned-risk pool was not mandatory. In fact, he stated that if Liberty wished to withdraw "from this mechanism the department will instruct NCCI to continue to assign the petitioner its proportionate share of these risks." It would be hard to conceive of more mandatory language than that used by the director. Indeed, when questioned at oral argument, counsel for the director suggested that the only alternative for nonparticipation in the assigned-risk pool was to withdraw from doing workers' compensation and employer's liability business within the state. Such an alternative would, indeed, be the type of Hobson's choice that could scarcely be called voluntary.

Moreover, an examination of the statutes fails to disclose any proceeding other than the one presented to the director pursuant to which Liberty could seek rate relief for the residual-market-load factor losses. It was not privileged to participate in the NCCI filing and no separate proceeding was available to it. The facts of this case wherein a filing was made on June 13, 1986, and the decision was rendered by the director on January 15, 1988, would indicate that the interval between filing a request for a rate increase and action thereon by the director would be approximately one and one-half years. Consequently, suggesting a separate proceeding for assigned-risk-rate relief in the vague terms offered by the director was scarcely a reasonable alternative to deciding the issue in the only proceeding to which Liberty was entitled.

■ In our opinion, the sole probative evidence in the case clearly and unequivocally established a 24 percent loss on assigned-risk cases. The Attorney General's witness stated that Liberty was entitled to a 10 percent increase without reference to the residual-market-load factor. He further suggested, and the director conceded, that a residual-market-load factor should be taken into account if participation in the assigned-risk pool was mandatory. The director then made it plain in his decision that such participation was mandatory if Liberty wished to continue to do business in Rhode Island. The director's refusal to decide this issue in the instant rating proceeding can only be described as arbitrary and thus in violation of § 42–35–15(g)(6). We also hold that the director's refusal to include in the rate calculation the losses incurred by Liberty as a result of participation in the assigned-risk pool was clearly erroneous in view of the reliable probative and substantial evidence on the whole record, § 42–35–15(g)(5). It is undisputed that if this 24 percent residual-market-load factor had been included in the rate calculation, Liberty's request for a 22.5 percent increase in rates would of necessity have been granted. Therefore, the trial justice

was in error in affirming the director's decision.

For the reasons stated, Liberty's petition for certiorari is hereby granted. The judgment of the Superior Court is quashed. The papers in the case are remanded to the Superior Court with directions to enter a judgment reversing the decision of the director and ordering the director to grant a rate increase of 22.5 percent to Liberty.