**HOMETOWN PROPERTIES, INC. et al.**

v.

**RHODE ISLAND DEPARTMENT
OF ENVIRONMENTAL
MANAGEMENT et al.**

No. 89–595–M.P.

Supreme Court of Rhode Island.

June 5, 1991.

Anthony F. Muri, Barbara S. Cohen, Goldenberg & Muri, Providence, for plaintiff.

Mark A. McSally, Cranston, Stephen Burke, Mark W. Siegars, Claude Cote, Kendra Beaver, DEM, for defendant.

## OPINION

KELLEHER, Justice.

This controversy is before us on a petition for certiorari brought by the defendants, the town of North Kingstown, the Rhode Island Department of Environmental Management (DEM), and Robert L. Bendick in his capacity as the director of DEM.[1] The defendants seek review of a decision of the Superior Court that reversed a final Decision and Order of DEM that denied the application of the plaintiffs, Hometown Properties, Inc. (Hometown), and Homevest, Inc. (Homevest), for a license to expand the operation of a sanitary-waste landfill located in North Kingstown, Rhode Island.

---

**1.** Since the commencement of this litigation, Robert Bendick left the employ of DEM and, at this point in time, his successor is Louise Durfee. Pursuant to Super. R. Civ. P. 25(d)(1), when a public officer ceases to hold office, his or her successor is automatically substituted as a party.

A brief synopsis of the relevant facts is in order before reaching the merits of defendants' appeal. Hometown, a Rhode Island corporation, operates a sanitary-waste facility in the town of North Kingstown (town). Homevest, also a Rhode Island corporation, holds title to the real estate on which the sanitary-waste facility is located.

The defendant DEM is the Rhode Island State agency that receives and processes applications for permission to operate sanitary-waste facilities like Hometown's landfill. Hometown first received a license from DEM to operate the landfill on November 12, 1980, and continued to operate the landfill over the next seven years. In each of those years, DEM relicensed the sanitary-waste facility.

In July 1987 Hometown submitted an application to the Division of Air and Hazardous Materials (division), the DEM department responsible for issuing licenses for solid-waste-management facilities. The division classified Hometown's submittal as an "application to expand the existing solid waste management facility located on Drybridge Road" in North Kingstown. The application for expansion sought to add approximately nine additional acres to the existing landfill for the disposal of demolition waste. The application was filed pursuant to G.L.1956 (1985 Reenactment) § 23–18.9–9.1,[2] which governs the disposal of solid waste over drinking-water sources.

In August 1987 the division denied Hometown's application for expansion in a decision signed by the division's chief, Thomas Getz (Getz). In denying the application, Getz concluded that "the licensing of an expansion of the Homevest landfill is prohibited by operation of R.I.G.L. § 23–18.9–9.1(b) and Rule 10.05 of the Rules and Regulations for Solid Waste Management Facilities." Rule 10.05 and § 23–18.9–9.1(b) were the only bases for the denial contained in the decision.

Subsequently, on August 21, 1987, Hometown instituted an administrative appeal of that decision by requesting a hearing to challenge the propriety of the denial. The town was permitted to intervene in the proceeding. At the hearing, DEM's argument in support of the denial of Hometown's application consisted of two parts. More specifically, in the words of the administrative-hearing officer:

"First is the location. We believe this is a critical factor, that the landfill overlies a designated ground-water aquifer, and the [DEM] is very concerned about the close proximity of this landfill to the town wells.

"[DEM also] believe[s Hometown] has not demonstrated an ability to comply with the solid waste regulations based on past practices."

The administrative-hearing officer issued a Decision and Order on September 2, 1988, containing numerous legal and factual findings and recommended to the DEM director that the application for licensure of the expanded solid-waste-management facility be denied on the basis of § 23–18.9–9.1(b). The hearing officer's Decision and Order became a final order of DEM when the DEM director endorsed it on September 6, 1988.

Shortly thereafter, on September 28, 1988, Hometown filed a complaint in the Superior Court against DEM and the town seeking judicial review of DEM's Decision and Order pursuant to G.L.1956 (1988 Reenactment) chapter 35 of title 42, the Administrative Procedures Act. The complaint averred that the Decision and Order "violates certain constitutional and statutory provisions, was made upon unlawful procedure, was affected by errors of law, was clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record, and was arbitrary, capricious, and characterized by an abuse of discretion."

The Superior Court justice rendered a decision reversing DEM's Decision and Or-

**2.** This statute was originally enacted in May 1982 by P.L.1982, ch. 33, § 1, as § 23–18.9–8.2. Following the 1985 statutory reenactment, the section heading of § 23–18.9–8.2 was changed to its current form. General Laws 1956 (1985 Reenactment) § 23–18.9–9.1, as it existed in 1987 at the time of Hometown's application, was identical to § 23–18.9–8.2 of 1982. The pertinent portions of the 1987 version of § 23–18.9–9.1 are set forth later in this opinion.

der and directing that Hometown's application be granted. The trial justice found, among other things, that the Decision and Order violated provisions of the United States and Rhode Island Constitutions. Following entry of final judgment, DEM then timely filed a petition for writ of certiorari seeking review of the decision and final judgment of the Superior Court pursuant to § 42–35–16. We granted the petition.

In its brief, Hometown now reasserts the same arguments on which it prevailed in the Superior Court to support its position that the Superior Court justice did not err in his decision. Conversely it is of no surprise that DEM and the town vigorously assert that the trial justice erred in all his determinations. We believe, however, that there is no necessity for us to address all the issues touched upon by the Superior Court justice in order for us to make our determination. Since the sole basis for the application denial articulated in the final DEM Decision and Order was § 23–18.9–9.1(b),[3] we are of the opinion that our attention should properly focus on whether the conditions precedent to the application of that statute were indeed met at the time of the denial.

■ Concerning our scope of review when reviewing a judgment of the Superior Court on a petition for certiorari, we have said on numerous occasions that the writ brings up the record of the lower court for review of questions of law only. *Berberian v. Department of Employment Security*, 414 A.2d 480, 482 (R.I.1980). "Questions of law * * * are not binding upon the court and may be reviewed to determine what the law is and its applicability to the facts." *Narragansett Wire Co. v. Norberg*, 118 R.I. 596, 607, 376 A.2d 1, 6 (1977). In this regard we have said before that a determination of whether conditions precedent to the application of a statute have been satisfied is a question of law that a trial justice may properly review pursuant to his or her authority under § 42–35–15. *See DeFalco v. Voccola*, 557 A.2d 474, 476 (R.I.1989).

■ With these standards in mind, we now turn our attention to the statute in question. The relevant portion of § 23–18.9–9.1,[4] as it existed in 1987, provided as follows:

"(b) No person shall dispose of solid waste on or in the ground overlying groundwater reservoirs or groundwater recharge areas, as identified on a map entitled 'State of Rhode Island "208" Areawide Water Quality Management Plan—Water Related Sensitive Areas' prepared by the Statewide Planning Program (project number FRC–JF–01–13); Provided, That such groundwater reservoirs or groundwater recharge areas have been designated on the basis of hydrogeologic data, as an existing or planned public drinking water source by the municipality in which such reservoir or recharge area is located and that such municipality has enacted a municipal ordinance relating to groundwater reservoirs or groundwater recharge areas.

"(c) Where an existing solid waste management facility-landfill overlies such groundwater reservoir or ground-

---

**3.** More specifically, the pertinent conclusions of law contained in the DEM Decision and Order stated as follows:

"2. The conditions precedent to application of R.I.G.L. § 23–18.9–9.1(b) have been met:
    (a) the Homevest site lies within the Annaquatucket–Pettaquamscutt ground-water recharge area identified on the 208 map;
    (b) the Town of North Kingstown utilizes the Annaquatucket–Pettaquamscutt groundwater reservoir as a public drinking water source;
    (c) the Town of North Kingstown has enacted a municipal ordinance relating to groundwater reservoirs and recharge areas.

"3. Although the municipal ordinance contains some ambiguity by virtue of its reference to the surface water drainage divide, the clear intent is to include and protect groundwater reservoir recharge areas, including the Annaquatucket–Pettaquamscutt recharge area in which the Landfill is located.
"4. R.I.G.L. § 23–18.9–9.1(b) constitutes an absolute prohibition against the siting of new or expanded solid waste management facilities if its conditions precedent are met."

**4.** Section 23–18.9–9.1 may hereafter occasionally be referred to as "the 208 statute" whereas the map referenced in § 23–18.9–9.1(b) will be referred to as "the 208 map."

water recharge area designated by the municipality in accordance with subsection (b) hereof, the director is authorized to order cessation of solid waste disposal operations and closure of said landfill under the following conditions:

(1) The municipality has, after notice and public hearing, by resolution to the director requested the director to determine whether the continued operation of any solid waste management facility-landfill on or over any such reservoir or recharge area presents a hazard to the public drinking water source; and

(2) The director after investigation, notice and hearing to said landfill, determines that such existing solid waste management facility-landfill does present a hazard to the public drinking water source.

"(d) Any party aggrieved by a decision of the director under this section may obtain judicial review of such decision in accordance with the provisions of §§ 42–35–15 and 42–35–16 of the administrative procedures act."

Subsection (b) of § 23–18.9–9.1 governs the issuance of new licenses and licenses for expansion whereas subsection (c) controls closure of existing solid-waste landfills that overlie groundwater reservoirs or groundwater recharge areas. In short, the 1987 version of § 23–18.9–9.1(b) prohibited the disposal of solid waste on or in the ground overlying groundwater reservoirs or recharge areas, as identified on the 208 map, only if such groundwater reservoirs or recharge areas had been designated as existing or planned public drinking-water sources by the municipality in which the reservoirs or recharge areas were located, the designation had been made on the basis of hydrogeologic data, and the municipality

had enacted an ordinance relating to groundwater reservoirs or recharge areas.

Reviewing these criteria in light of the evidence contained in the administrative record, the trial justice concluded that the conditions precedent to the application of the 208 statute had not been satisfied. His determinations are worth repeating here. With respect to whether the town properly designated the landfill site in an ordinance on the basis of hydrogeological data, the trial justice stated:

"It is questionable whether or not the landfill is located in an area that has been designated by the Town in accordance with the 208 statute. No evidence whatsoever was presented that the Town has designated the location of the landfill as an existing or planned public drinking water source, let alone that the Town has made such a designation on the basis of hydrogeologic data.

"In addition, no evidence whatsoever was presented that the Town has enacted an ordinance relating to groundwater recharge areas pursuant to the 208 statute. Indeed, the evidence clearly shows that the Town has not done so."

The trial justice went on to say that the ordinances enacted by the town were primarily zoning ordinances and had little to do with groundwater reservoirs or recharge areas pursuant to the 208 statute and that, therefore, the conditions precedent to the application of § 23–18.9–9.1(b) had not been met. After a thorough consideration of the 208 statute and the evidence in the record, we are of the opinion that the trial justice was correct in concluding that the conditions precedent to the application of the 208 statute were not met and that, therefore, the denial of the expansion license on this basis was improper.

First, we agree with the trial justice's conclusion that the North Kingstown town ordinances were zoning ordinances[5] and

5. The purposes of the article entitled "Overlay Districts" in the North Kingstown Zoning Ordinances are articulated in sec. 17–8–1 as follows:

"17–8–1 *Purpose of Article:*
Overlay Districts establish additional requirements for the primary *zoning districts* based upon specific hazards and problems outlined in the Soil Survey of Rhode Island

prepared by the United States Department of Agriculture, Soil Conservation Service, the Flood Insurance Rate Maps for the Town of North Kingstown, Rhode Island published by the Federal Emergency Management Agency dated February 16, 1983, as amended from time to time, and in the report of the United States Geological Survey on ground water re-

were not enacted to protect "groundwater reservoirs or groundwater recharge areas" as contemplated in the 208 statute. Indeed chapter 17, article VIII, of the Ordinances of the Town of North Kingstown, the chapter in which the ordinances in question are found, was entitled "Zoning Ordinances" at the time of its enactment in 1974. Moreover, the fact that the ordinances were enacted in 1974, eight years before the enactment of the 208 statute, is a strong indicator that the ordinances were not promulgated with the requirements of the 208 statute in mind. Furthermore, testimony elicited at trial from DEM's witnesses indicates that "groundwater reservoir recharge area," a term on which the 208 statute focuses, is nowhere to be found in "Hydrology, Potowomut–Wickford Area, Rhode Island," United States Department of the Interior Geological Survey Water Supply Paper 1775, the report to which reference is made in the zoning ordinance pertaining to groundwater resources.

In addition, even if we assume that the North Kingstown town ordinances in question satisfied the "municipal ordinance" requirement under the 208 statute as it existed, we do not believe that the town, through the ordinances, properly designated the exact site where the landfill is located as "an existing or planned public drinking water source" in accordance with the statute's requirements.

Relying upon our understanding of the 1987 version of § 23–18.9–9.1(b), in particular the sentence reading "Provided, That such groundwater reservoirs or recharge areas have been designated," we believe the town was required specifically to designate groundwater reservoirs and recharge areas as they were delineated on the 208 map. Use of the phrase "such groundwater reservoirs or * * * recharge areas" indicates that the recharge areas and reservoirs listed in the preceding sentence, that is, those "identified on [the 208] map," are the ones that must be specifically designated by the municipal ordinance in order to receive the protection of § 23–18.9–9.1.

The areas designated in the North Kingstown town ordinances [6] are those delineat-

sources. (As amended, Ord. No. 83–1, § 1, 1–24–83.) *Editor's note.*—[The latter] report may be found in *Hydrology, Potowomut–Wickford Area,* Rhode Island, U.S. [Department of the Interior] Geological Survey Water Supply Paper 1775. Rosenshein, Gauthier and Allen.

The administrative officer of the Zoning Ordinance shall determine when an overlay district and its requirements *regulate the granting of a building permit.* The location of the primary structure shall determine the application of overlay requirements. An engineering soil survey to determine suitably of land for development, upon review of the Soil Conservation Service, shall supersede the overlay district map. (4–8–74, § 10.)" (Emphasis added.)

6. Two of the North Kingstown ordinances specifically mentioned in DEM's Decision and Order as satisfying the "municipal ordinance" requirement under § 23–18.9–9.1 provide as follows:

"*Sec. 17–8–6. Ground water recharge overlay districts.*

(a) *Designation:* This district includes all land in the town described in the report of the United States Geological Survey on ground water resources, *Hydrologic Characteristics and Sustained Yield of Principal Ground Water Units, Potowomut–Wickford Area, Rhode Island,* upstream of any public well site and lying within the drainage basins of the Hunt, Annaquatucket and Pettaquammscutt Rivers,

and having a transmissivity greater that 0 gallons per day per foot.

(b) *Characteristics:* The character of soils and subsoil conditions is such in these areas that any use introducing pollutants into the natural drainage system could adversely affect the quality of municipal drinking water sources.

(c) *Permitted uses:* Any use permitted in the primary zoning district which discharges effluent into the ground that meets the chemical standards of the United States Environmental Protection Agency.

(d) *Special exceptions:* All other uses permitted in the primary zoning district provided that proof be submitted that the proposed use will not cause pollution.

(e) *Minimum requirements:* Minimum requirements shall be as specified in the primary zoning district. (4–8–74, § 10.)

"*Sec. 17–8–7. Ground water reservoir overlay district.*

(a) *Designation:* The ground water reservoir overlay district includes all lands in the town described as having a saturated thickness of over forty feet and a transmissivity greater than sixty thousand gallons per day in the report of the United States Geological Survey, *Hydrologic Characteristics and Sustained Yield of Principal Ground Water Units, Potowomut–Wickford Area, Rhode Island.*

(b) *Characteristics:* The lands in the ground water reservoir overlay district are the princi-

**846**

ed in the United States Department of the Interior Geological Survey Water Supply Paper 1775, the full title of which reads "Hydrologic Characteristics and Sustained Yield of Principal Ground Water Units Potowomut–Wickford Area Rhode Island." However, evidence in the record clearly indicates that although the landfill may be located within a groundwater reservoir or recharge area as set forth in the 208 map, the landfill was definitely not located within the boundaries of the reservoir overlay districts designated by the town ordinances vis-à-vis the United States Geological Survey study. For example, in the initial application denial by the division, Getz wrote that "DEM's engineering review of the materials submitted determined that the proposed expansion lies outside the area designated in United States Geological Survey on Ground Water Resources, Hydrological Characteristics and Sustained Yield of Principal Ground Water Units, Potowomut–Wickford Area, Rhode Island as identified in the Municipal Ordinance Map, but within the boundaries of the State of Rhode Island '208 Areawide Water Quality Management Plan—Water Related Sensitive Areas' map."

Additionally, testimony elicited at trial fully supported Getz's determination. Margaret Dein Bradley (Bradley), a witness for DEM, at the time of the hearing was a hydrogeologist in DEM's Groundwater Protection Division and was qualified without objection as an expert in hydrogeology. Bradley testified that the map referenced in the town's ordinances was based on surface-water drainage divides whereas the 208 map delineated areas on the basis of groundwater divides. Bradley also admitted that the landfill "site lies outside the surface water divide of the map that was referred to in the ordinance." Bradley further testified that the "intent" of the ordinances was to protect the entire Annaquatucket–Pettaquamscutt recharge area on

pal source of drinking water in the town. As such they must carefully be protected from pollution.
(c) *Permitted uses* are single-family residential, recreation, conservation and agriculture.
(d) *Minimum requirements:*

the 208 map but conceded that "the map * * * cited [in the ordinance] used the surface water drainage divide, and in this instance, * * * the groundwater divide [on the 208 map] and [the ordinance map's] surface water divides didn't coincide."

Susan Kiernan (Kiernan), Bradley's supervisor, was proffered as DEM's expert witness in the administration of groundwater protection. Kiernan also testified that the "U.S.G.S. [ordinance] map does not include the entire recharge area to the Annaquatucket–Pettaquamscutt groundwater aquifer" as delineated on the 208 map. When asked whether the landfill site lies outside the area covered by the map referenced in the town ordinances, Kiernan stated, "It does lie outside the boundary of the map referenced in the Town ordinance."

Indeed, even Vincent Tarducci, a graphics coordinator for the 208 water-pollution-control planning process who constructed the final 208 map, conceded that the groundwater and surface-water basins in the area in question do not coincide and that the Hometown site lies between the two boundaries.

Getz, Bradley, Kiernan, and Tarducci all expressed the view, without contradiction, that the landfill site, although within the recharge area as delineated on the 208 map, was not within the boundaries of the surface-water drainage divide as delineated on the ordinance map. Despite this uncontroverted testimony, the hearing officer concluded that "[a]lthough the municipal ordinance contains some ambiguity by virtue of its reference to the surface water drainage divide, the clear intent is to include and protect groundwater reservoir recharge areas, including the Annaquatucket–Pettaquamscutt recharge area in which the landfill is located." We tend to think otherwise.

A question that immediately comes to mind is why, if the town sought to desig-

(1) Maximum lot coverage: Twenty percent,
(2) Lot area: Three acres, three hundred feet frontage, or
(3) Average density: One-third dwelling unit per acre. (4–8–74, § 10.)"

nate groundwater reservoirs and recharge areas pursuant to the 208 map, did the town ordinances cite a map dealing with surface-water drainage divides instead of groundwater divides, reservoirs, or recharge areas? If the town "clearly intended" to protect and to designate the areas delineated on the 208 map, it could have done so expressly by amending its ordinances accordingly, following the enactment of the statute in 1982. The record is devoid of any evidence indicating that the town made any such efforts. Quite simply, even if the landfill does overlie a groundwater reservoir or recharge area, the designation made by the town ordinances falls short of including the particular area in which the Hometown site is located. If one assumes that the ordinances in question satisfy the "municipal ordinance" requirement of the 208 statute, the designation made by the ordinances simply does not include the Hometown landfill. If the area in question was not properly designated, the conditions precedent to the application of § 23–18.9–9.1(b) were not satisfied, and therefore, the statute, as a matter of law, could not be used as a basis upon which to predicate denial of Hometown's application.

For the reasons stated above, the DEM petition for certiorari is denied, the writ previously issued is quashed, and the judgment of the trial court is affirmed.