The **ENVIRONMENTAL SCIENTIFIC CORPORATION**

v.

**Louise DURFEE, in her capacity as director of the Department of Environmental Management.**

**No. 91–644–M.P.**

Supreme Court of Rhode Island.

March 2, 1993.

John Tarantino, Patricia Rocha, Adler, Pollock & Sheehan, Providence, for plaintiff.

Kendra Beaver, Catherine Robinson Hall, Dept. of Environmental Management, for defendant.

## OPINION

FAY, Chief Justice.

This case comes before this court pursuant to a writ of certiorari. The petitioner, the Environmental Scientific Corporation (ESC), seeks relief from a Superior Court judgment that affirmed the Department of Environmental Management's (DEM or department) denial of a water-quality certificate and an application to alter freshwater wetlands (application).[1] The ESC maintains that the DEM improperly overturned

---

**1.** On July 1, 1993, the DEM will be renamed the Department of the Environment (DOE) pursuant to G.L. 1956 (1988 Reenactment) § 42–17.1– 1, as amended by P.L. 1990, ch. 461, § 2. All DEM regulations will remain in force until the DOE issues new rules and regulations.

the decision of its administrative hearing officer. After a careful review of the proceedings, we agree.

The ESC's contentions consist of two basic components. First it avers that the DEM's actions went awry of proper administrative procedures and that, therefore, its decision resulted in a denial of procedural due process. More specifically it claims that the DEM engaged in unauthorized rulemaking, that the DEM rejected the hearing officer's findings without an adequate rationale, and that the DEM's denials were not supported by any evidence in the record. Second, if upheld, the denials of the water-quality certificate and the application constitute an unconstitutional taking of the ESC's property. We do not believe that it is necessary for us to address all the issues touched upon in the ESC's petition in order for us to make our determination. Since we dispose of this case on the ESC's first issue, we need not reach the merits of its takings argument.

An understanding of the administrative procedures of the DEM will help to clarify the issues before us. The Freshwater Wetlands Act (Wetlands Act), G.L.1956 (1987 Reenactment) § 2–1–18 through § 2–1–27, gives the director of the DEM responsibility for identifying, protecting, and regulating development within Rhode Island's freshwater wetlands. *Vito v. Department of Environmental Management*, 589 A.2d 809, 810 (R.I.1991). Pursuant to § 2–1–20.1 the director promulgates rules and regulations governing the enforcement of the Wetlands Act (wetlands regulations).

If the DEM decides that a land-use proposal represents a significant alteration of a wetland, the applicant must file a formal application to alter a wetland. The DEM then reviews the formal application and conducts a site inspection. An applicant denied a permit by the DEM may initiate formal proceedings by requesting a hearing before the division of administrative adjudication (division). The division may then conduct prehearing conferences and hearings and perform other adjudicatory functions. Should an applicant request a hearing, G.L.1956 (1988 Reenactment) § 42–17.7–6, as enacted by P.L.1989, ch. 508, § 1, provides for adjudication before a hearing officer and review of that decision by the director.

Pursuant to the Administrative Procedures Act (APA), G.L.1956 (1988 Reenactment) chapter 35 of title 42, the DEM has adopted rules of practice and procedure for proceedings before the division. All hearings occur before an administrative hearing officer. The hearing officer has the duty of conducting the hearing and making decisions regarding the admission of evidence according to the Rhode Island Rules of Evidence. Section 42–35–10. The weight to be given to any evidence rests with the sound discretion of the hearing officer. All parties have the right to present evidence, cross-examine witnesses, and make objections, motions, and oral arguments. The hearing officer may also permit public participation.

At the conclusion of the hearing, the hearing officer issues a written decision and order (decision) to the director of the DEM. As set forth in § 42–17.7–6(1), the decision is made public when submitted to the director for review. The director may adopt, modify, or reject the hearing officer's decision. The director then issues a final agency decision and order (final decision). The final decision must be in writing and contain a statement of reasons and a determination of every issue of fact or law. If it is determined that an applicant's proposed land use would require alterations of freshwater wetlands that are inconsistent with the purposes of the Wetlands Act, the application for a permit is denied. As delineated in wetlands regulation 5.03(c), the director has the authority to deny a proposed wetlands alteration "if, in his opinion, such alteration will cause random, unnecessary and/or undesirable destruction of fresh water wetlands including, but not limited to: * * * [d]egradation of the natural character of any 'unique' wetland * * * [and] [r]eduction of the value of any 'valuable' wetland."

The DEM's final decision is reviewable on appeal by the Superior Court pursuant to § 42–35–15 of the APA. The review is

conducted by the court without a jury and is confined to the record compiled during the adjudicatory proceeding.

The events giving rise to this litigation began on January 4, 1985, when Westerly Commercial Associates filed an application with the DEM, Division of Freshwater Wetlands, for permission to alter and fill approximately six acres of freshwater wetlands. Westerly Commercial Associates (WCA) proposed to alter wetlands in the Aguntaug Swamp in Westerly. The DEM denied the application, and WCA requested an administrative hearing. During the course of the hearing, WCA amended its application to divide the project into two phases, phase I and phase II. The hearing officer held that phase I was outside the department's jurisdiction and ordered the department to issue a permit. The focus of our inquiry concerns the DEM's treatment of phase II.

On October 27, 1987, the ESC filed an application, No. 87–0557F, on behalf of the property owners, WCA, to alter 2.92 acres of freshwater wetlands permanently and proceed with phase II. The phase II proposal contemplates the construction of buildings, paved parking areas, and drainage structures along the southern and western perimeters of Aguntaug Swamp. The proposal involves the filling in and relocation of a river and an intermittent stream.

The department referred the ESC's application to its Division of Water Resources to determine whether to issue a water-quality certificate for the proposal. On April 12, 1989, the Division of Water Resources denied the issuance of a water-quality certificate. The department subsequently denied the application on the grounds that the proposed alterations were inconsistent with both the public policy stated in the Wetlands Act and the department's own regulations. The ESC's appeals from both denials were consolidated for an administrative hearing.

Public hearings were conducted before a hearing officer pursuant to § 2-1-22, the APA, § 42-35-9, and the DEM's regulations. Over a period of nine days the ESC presented eight of its own witnesses and called three DEM employees to testify. The department presented five witnesses. The hearing officer permitted public participation and several objectors appeared, representing various public-interest groups. On August 22, 1990, the hearing officer reversed the department's decision. He recommended to the director of the DEM that the water-quality certificate and the application be granted.

The hearing officer made numerous findings of fact and conclusions of law. Relying on his findings of fact, the hearing officer concluded that the proposed alterations will "not cause unnecessary and/or undesirable destruction of freshwater wetlands as described in Section 5.03" of the wetlands regulations. In addition to his other conclusions, the hearing officer declared that

"the proposed alterations will not result in significant loss, encroachment, and permanent alteration of a unique and valuable freshwater wetland.

"5. The proposed project will not reduce the value of the wetlands recreational potential [or the] aesthetics and actual character of the wetland and buffer zone.

"6. The proposed project will not reduce the ability of the subject wetland area to recharge a groundwater aquifer, to wit Westerly Chapman Swamp aquifer.

"7. The proposed project will not reduce the ability of a wetland tributary to a proposed public water supply to remove pollutants from service water."

Following the reversal by the hearing officer, the matter was referred to the director of the DEM for the issuance of a final decision.[2] On November 2, 1990, the director reversed the hearing officer and denied the water-quality certificate and the application.

In his final decision the director asserted that the hearing officer "adopt[ed] wholesale the applicant's proposed findings of fact and conclusions of law." The director wrote that the hearing officer interpreted

2. The director of the DEM recused himself, and a designated director issued the final decision.

the DEM's rules and regulations "in a manner which is, in fact, clearly contrary to the agency's and the responsible Division's historic and articulated interpretation of their meaning, purpose and intent and, furthermore, in a manner which, if left uncorrected, will result in violations of applicable law and regulation." In summary, the director reversed the hearing officer's decision for the following reasons:

"The recommended Decision and Order would have the effect of subjecting 'valuable' and 'unique' wetlands such as the Aguntaug Swamp to inevitable incremental degradation in a manner which is prohibited by sections 5.03(c)(6) and (7) of the Rules and Regulations Governing the Enforcement of the Freshwater Wetlands Act and which, further, runs contrary to the expressed legislative intent underlying the Freshwater Wetlands Act; 'to *preserve* and regulate the use of swamps, marshlands, and other freshwater wetlands'. * * * The recommended Decision and Order would also have the effect of authorizing the further degradation of water quality in an area not presently in compliance with applicable water quality standards and criteria set for it by law and regulation; this [is] in violation of Water Pollution Control Regulation 7.2."

The ESC appealed the final decision to the Superior Court pursuant to § 42-35-15. The Superior Court affirmed the director's final decision. Following entry of final judgment, the ESC then timely filed a petition for writ of certiorari, seeking review of the final decision and judgment of the Superior Court pursuant to § 42-35-16.

The ESC requests this court to review the proposition that the director should accord a deferential standard of review toward the hearing officer's findings of fact and conclusions of law. The ESC argues that the hearing officer's decision was predicated upon credibility assessments. It asserts that we should apply the same standard that we use in workers' compensation appeals when credibility is in issue. Therefore, the ESC claims, before rejecting findings based on credibility determinations, the director must find that the hearing officer was clearly wrong. *See Hicks v. Vennerbeck & Clase Co.*, 525 A.2d 37, 41 (R.I.1987). The ESC additionally contends that the DEM failed to rest its blanket rejection of the hearing officer's decision upon an articulated rationale as required by § 42-17.7-6(1). In support of this claim it asserts that the director's conclusion that the hearing officer's interpretation of the wetlands- and water-quality regulations was clearly contrary to the "historic and articulated interpretation of their meaning, purpose and intent" was without foundation. The ESC claims that the director's decision should be overturned because he was unable to point to substantial evidence in the record to contradict the hearing officer's findings and conclusions.

The DEM objects to both the characterization of the director's final decision and the standard of review that an agency should afford to a hearing officer's decision. The DEM argues that not only did the director set forth a rationale for his rejection of the hearing officer's decision but his explanation also repeatedly referred to the evidence on the record. In addition, according to the governing statute, the hearing officer's decision consists of proposed findings of fact and proposed conclusions of law. Upon review the director of the DEM has the discretion to adopt, to modify, or to reject the hearing officer's proposals without particular deference to the hearing officer's findings. Moreover, the department argues that the analogy to workers' compensation is an apt one. Because no credibility determinations were in issue, the controlling statute effectively requires the director to conduct a de novo review of an administrative hearing record. *Miller v. American Airlines, Inc.*, 582 A.2d 440, 441 (R.I.1990).

The parties agree that § 42-17.7-6(1) governs the agency review process in this case. Section 42-17.7-6(1) states in part:

"After due consideration of the evidence and arguments, the hearing officer shall make written proposed findings of fact and proposed conclusions of law which shall be made public when submitted to the director for review. The director

may in his or her discretion adopt, modify or reject such findings of fact and/or conclusions of law provided, however, that any such modification or rejection of the proposed findings of fact or conclusions of law shall be in writing and shall state the rationale therefor."

Our interpretation of this statute is guided by our prior analysis of similar provisions and established tenets of administrative procedure. Our examination is divided into three parts. We begin with the presence and impact of credibility decisions. The second part analyzes the functional relationship between the hearing officer and the agency. In the final part we assess the evidentiary foundations of the DEM's reversal.

I

The initial disagreement between the parties centers on whether credibility determinations influenced the trial examiner's factual and legal conclusions. Moreover, if such determinations were made, to what extent must the agency director defer to the hearing officer when issuing a final decision. To resolve this issue, we draw upon analogous situations in administrative law and workers' compensation decisions. We have a well-settled body of law concerning the applicable standard of review when the Workers' Compensation Appellate Division (appellate division) examines the credibility determinations of the Workers' Compensation Court.[3]

The pertinent workers' compensation statute is strikingly similar to § 42–17.7–6(1). Rhode Island's workers' compensation statutes appear to give the appellate division the ability to reject factual findings de novo. Pursuant to G.L.1956 (1986 Reenactment) § 28–35–28, as amended by P.L. 1990, ch. 332, art. 1, § 5, upon review of

the trial judge's decision the appellate division "shall affirm, reverse or modify the decree appealed from." Our interpretations of this review process recognize, however, the unique position of the trial examiner.

The presence of credibility determinations at the trial level raises the level of scrutiny that the appellate division applies. The trial judge's impressions as he or she observes a witness and listens to testimony "are all important to the evidence sifting which precedes a determination of what to accept and what to disregard." *Laganiere v. Bonte Spinning Co.*, 103 R.I. 191, 196, 236 A.2d 256, 258 (1967). Observations of live testimony necessarily enter into a determination of what the trial judge believes and disbelieves. *Id.* at 196, 236 A.2d at 259. " 'The weight of the evidence * * * is to be determined by the touchstone of credibility.' That touchstone, however, is not available to the [appellate division] which never sees the witness or hears him testify and which, on review, looks only at a silent record." *Id.* As a consequence, when credibility evaluations are implicated, we have imposed a standard of review upon the appellate division that requires it to defer to the evidentiary findings of the trial judge. Before disturbing findings based on credibility determinations, the appellate division must first find that the trial judge was clearly wrong.[4] *See, e.g., Hicks*, 525 A.2d at 41; *Grimes Box Co. v. Miguel*, 509 A.2d 1002, 1004 (R.I.1986); *Mulcahey v. New England Newspapers, Inc.*, 488 A.2d 681, 683 (R.I.1985); *Davol, Inc. v. Aguiar*, 463 A.2d 170, 173–74 (R.I.1983); *Laganiere*, 103 R.I. at 197, 236 A.2d at 259.

In contrast, the absence of credibility decisions streamlines the appellate review process. Credibility is not in issue when all the evidence presented is in written form or

---

**3.** Pursuant to G.L.1956 (1986 Reenactment) §§ 28–29–26, 28–30–2, and 28–35–28, as amended by P.L.1990, ch. 332, the Workers' Compensation Commission is now known as the Workers' Compensation Court. The commissioners are referred to as judges, and the appellate commission is known as the appellate division.

**4.** We are guided by a similar standard when we review Superior Court judgments concerning

administrative-agency decisions under G.L.1956 (1988 Reenactment) § 42–35–15. When the agency is the trier of fact, "[a] court must not substitute its judgment for that of the agency in regard to the credibility of the witnesses or the weight of the evidence concerning questions of fact." *Costa v. Registrar of Motor Vehicles*, 543 A.2d 1307, 1309 (R.I.1988).

the evidence relied upon is uncontradicted. *Verte v. Mearthane Products Corp.*, 583 A.2d 524, 528 (R.I.1990); *Miller*, 582 A.2d at 441. When firsthand observations are not in issue, the appellate division may review the findings of the trial judge de novo. *Miller*, 582 A.2d at 441.

First we evaluate whether credibility determinations were made by the administrative hearing officer. In *Davol, Inc. v. Aguiar* the trier of fact observed conflicting live testimony, and we opined that "the trial [judge] faced conflicting medical testimony." 463 A.2d at 174. Therefore, "[h]e necessarily made a determination of each witness's credibility when he rejected certain testimony and accepted other testimony." *Id.*

■ In the instant case the environmental experts' testimony was the subject of similar analysis. The hearing officer analyzed the testimony of at least twenty-four witnesses and objectors. He evaluated the testimony of several witnesses to determine whether the ESC's application complied with the department's standards. Most significantly, the hearing officer had the opportunity to weigh the live testimony of the department's experts against that of the ESC's experts. The experts presented the hearing officer with their competing assessments of three different tests that were conducted to evaluate the impact of phase II on the area.

Our review of the record indicates that the hearing officer was presented with adverse witnesses who offered conflicting testimony. The hearing officer had to sift through the testimonial evidence and select which facts carried the greatest weight. He then evaluated whether the credible evidence supported a finding that conformed to the department's regulations. He accepted opinions from the ESC's experts and rejected the formulations of the DEM's experts. Credibility determinations were necessarily implicated in the hearing officer's decision.

## II

■ The relationship between the hearing officer and the DEM director is set forth in § 42–17.7–6. We are mindful that the agency bears responsibility for the final decision and that it possesses the statutory authority to overrule the decision made by the hearing officer. Moreover, an administrative officer deciding a case upon recommendations by a hearing officer need not actually hear the witnesses testify or hear oral argument, but the decision maker must consider and appraise the evidence before rendering a decision. We do acknowledge that the decision maker may reject the hearing officer's recommendations on questions involving the credibility of contradictory witnesses. The agency director need not accept the hearing officer's findings if there is other, competent evidence in the record to support the agency's conclusion. *See* § 42–35–15(g)(5).

Despite the agency's role as final arbiter of wetlands policy, the hearing officer is nevertheless an indispensable element of administrative procedure. We would be remiss if we permitted the scope of a hearing officer's role to diminish in light of the function he or she serves in administrative problem solving. Our Legislature has created two administrative mechanisms for enforcing its policies. Each system places the factfinder at a different vantage point, altering the function of agency review.

One type of agency review employs a single level of scrutiny and is exemplified by the Public Utilities Commission (PUC). The PUC administrative-hearing process in function is akin to a drainless basin into which liquids are poured. The PUC, as one level of policy review, is the repository into which flows all sources of information from which it forms its decision. The decision is final within the administrative structure.

■ In contrast, the Legislature has created a funnel-like system for evaluating wetlands-related, collective-action problems. Sitting as if at the mouth of the funnel, a hearing officer hears testimonial and documentary evidence from all affected parties: the applicant, the department, and interested members of the public. Just as the funnel narrows, the hearing officer analyzes the evidence, opinions, and concerns of which he or she has been made aware and issues a decision. At the dis-

charge end of the funnel, the DEM director reviews the hearing officer's findings and issues a final decision. Because the director sits at the narrowest point of the funnel, he or she is not privileged personally to hear or witness the broad spectrum of information that entered the widest end of the funnel. Therefore, the further away from the mouth of the funnel that an administrative official is when he or she evaluates the adjudicative process, the more deference should be owed to the factfinder.

### III

The administrative structure in § 42–17.7–6 both reaffirms the director's role as the ultimate administrative decision maker and detaches the hearing officer's factual findings from an agency's capricious reversal or modification. Section 42–17.7–6 also requires the DEM to ground its rejection of the hearing officer's findings upon an adequate rationale. To withstand our scrutiny the DEM's rationale should be supported by competent legal evidence.

The scope of review of this court, like that of the Superior Court, is an extension of the administrative process. Pursuant to § 42–35–15, that review is restricted to questions that the agency itself might properly entertain. *Easton's Point Association v. Coastal Resources Management Council*, 522 A.2d 199, 202 (R.I.1987). The Superior Court is confined to a determination of whether there is any legally competent evidence to support the agency's decision. *Barrington School Committee v. Rhode Island State Labor Relations Board*, 608 A.2d 1126, 1138 (R.I.1992). "If competent evidence exists in the record considered as a whole, the court is required to uphold the agency's conclusions." *Id.* However, it may reverse or modify the agency's final decision if it is "[c]learly erroneous in view of the reliable, probative, and substantial evidence on the whole record." Section 42–35–15(g)(5).

In the instant case the Superior Court examined the record and determined that the DEM's rationale was not subject to reversal or modification. The court was persuaded that the final decision was grounded in the director's interpretation of state law, regulations, and public policy. The court recognized that the interpretation given a statute by the administrative agency is entitled to great weight. *See Berkshire Cablevision of Rhode Island, Inc. v. Burke*, 488 A.2d 676, 679 (R.I.1985). Accordingly the court affirmed the DEM's final decision.

This court's review is conducted in accordance with § 42–35–16. In evaluating judgments of the Superior Court, we are similarly engaged in a continuation of administrative proceedings. *Easton's Point Association*, 522 A.2d at 202. Our review must conform to the standards set forth in § 42–35–15. We are not privileged to assess the credibility of witnesses and may not substitute our judgment for that of the trial examiner concerning the weight of the evidence on questions of fact. *Liberty Mutual Insurance Co. v. Janes*, 586 A.2d 536, 537 (R.I.1991). We do, however, retain the power to review all questions of law. *Hometown Properties, Inc. v. Rhode Island Department of Environmental Management*, 592 A.2d 841, 843 (R.I.1991). This function permits us to determine whether there is any legally competent evidence to justify the conclusions of the reviewing court and agency. *Barrington School Committee*, 608 A.2d at 1138. Legally competent evidence is indicated by the presence of "some" or "any" evidence supporting the agency's findings. *Sartor v. Coastal Resources Management Council*, 542 A.2d 1077, 1082–83 (R.I.1988). Should we find the record deficient, "an administrative decision can be vacated if it is clearly erroneous in view of the reliable, probative, and substantial evidence contained in the whole record." *Costa v. Registrar of Motor Vehicles*, 543 A.2d 1307, 1309 (R.I.1988).

The DEM's final decision overturned the hearing officer's decision declaring that it would have the effect of subjecting the Aguntaug Swamp to inevitable incremental degradation in violation of wetlands regulations 5.03(c)(6) and (7). The project would also further degrade the water quality in the area. The final decision explains that the hearing officer misapplied

and misinterpreted wetlands regulation 5.03(c) and water-pollution-control regulation 7.2. The department's primary expert witness, Brian Tefft (Tefft), testified extensively on the impact that phase II would have upon the unique and valuable wetlands in the Aguntaug Swamp. The debate between the parties centers on Tefft's testimony.

The ESC contends that even though the parties stipulated that the swamp and the area of the proposal fall within the department's definition of a unique and valuable wetland, the hearing officer concluded that phase II will not degrade the natural character of the wetland or reduce its value. The ESC directs our attention to Tefft's testimony and contends that it was merely speculative and that he could not give an opinion to a reasonable degree of certainty. In addition, Tefft's assertions are undermined by his admission that they were not predicated upon the results of a required modified Golet evaluation (MGE). The ESC also claims that the DEM's failure to address the ability of the wetland area to recharge a ground-water aquifer is an admission of its validity.

The DEM counters that its final decision is anchored by several evidentiary footings. The DEM claims that the results of an earlier MGE test demonstrate that the nature and character of the swamp would be degraded. It argues that the requisite MGE test is only one element used in the department's review of the application. Moreover, all the other factors the department evaluated in its field ecological survey were appropriate and unchallenged.

We are of the opinion that the ESC's contentions are accurate and eventually dispositive. Wetlands regulations 5.03(c)(6) and (7) restrict the "[d]egradation of the natural character of any 'unique' wetland" and/or the "[r]eduction of the value of any 'valuable' wetland." The director's reversal of the hearing officer's decision rests upon the degradation or reduction in value that would occur in this freshwater wetlands should phase II be completed. The final decision repeatedly relies on Tefft's testimony. However, Tefft was unable to

render an opinion to a reasonable degree of scientific certainty. He also acknowledged that his assertions were not based upon a recently conducted MGE test. In addition, the ESC's experts all testified to a reasonable degree of scientific certainty that building phase II would not result in the degradation of the surface and ground water and the ability of the swamp to remove pollutants from its surface water. The hearing officer rejected Tefft's testimony and accepted that of the ESC's experts. Our further review of the record reveals that the DEM has cavalierly shunted aside the hearing officer's conclusions without regard for his factfinding.

In the past we have put forth a stringent test of substantial evidence pursuant to our review of administrative decisions. When an administrative agency both hears evidence and issues a final decision, we have held that a reviewing court should "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." *Milardo v. Coastal Resources Management Council*, 434 A.2d 266, 272 (R.I.1981). *See Sartor*, 542 A.2d at 1083. In contrast, the matter before us is the product of a two-tiered agency review. The APA requires us to search the record for substantial evidence. Yet in our inquiry we cannot overlook the body of law that elevates the factfinder's role when credibility is in issue. In light of our discussion the equation we use to determine whether substantial evidence exists factors in both credibility determinations and the corresponding deference to the hearing officer's findings.

We find that the DEM's final decision fails to rest upon sufficient evidentiary support to overcome the deference it must accord the hearing officer's decision. The director should give great deference to the hearing officer's findings and conclusions unless clearly wrong. Moreover, it is our opinion that the DEM's rationale must be substantiated by more than mere philosophical differences with the hearing officer. An adequate rationale is one that relies on a previously articulated standard

and is supported by substantial evidence in the record. We are of the opinion that the department's final decision did not set forth such a rationale and therefore exceeded its authority under the Wetlands Act.

For the reasons stated, the ESC's petition for certiorari is granted and the judgment of the Superior Court is quashed. The papers in this case are remanded to the Superior Court with our decision endorsed thereon.