[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
This matter is before this Court on an appeal by Lawrence Creed, Ethel Creed, John Campbell and Judith Campbell ("Petitioners") from a March 6, 1989 final decision of the Coastal Resources Management Council ("CRMC" or "Council") denying their application for a State Assent to fill and maintain the upper portion of a lot up to but not including a fifty foot buffer zone from a coastal wetland in Warwick. This Court has jurisdiction pursuant to R.I. Gen. Laws 1956 (1993 Reenactment) § 42-35-15.
FACTUAL BACKGROUND AND PROCEDURAL HISTORY
Petitioners are the owners of a parcel of land located at Pole #12, Kristen Court in the City of Warwick, which is contiguous to the properties on which they live. The subject land drops off in a steeply sloping bank abutting the coastal wetlands of Occupasstuxet Cove and is within the two hundred foot buffer controlled by CRMC and subject to that administrative body's control and review. The Audubon Society owns a strip of land between Petitioners' property and the shore.
Petitioners' proposal would replace the steep slope with two banks, a small level area approximately halfway down, and a double line of fence at the bottom where the slope meets the coastal wetlands. (Tr. I at 51).
A preapplication inspection of the site was conducted on November 6, 1986 by Nicholas A. Pisani, P.E. Petitioners subsequently filed their application for State Assent in May, 1987. A CRMC Biologist's Report filed on October 5, 1987 indicated that a Special Exception would be required. The October 26, 1987 Notice of Public Hearing also indicated that a Special Exception would be needed. After receiving that notice, Petitioners requested and were granted a postponement. The public hearing commenced on January 12, 1988 and continued on March 22, 1988 and December 13, 1988. On the final hearing date the members of the Council voted to deny the application. The CRMC issued its final decision on March 6, 1989 and the instant appeal followed.
STANDARD OF REVIEW
This Court is granted jurisdiction to review decisions of the Coastal Resources Management Council pursuant to R.I. Gen. Laws 1956 (1993 Reenactment) § 42-35-15. This statute also mandates the scope of review permitted by this Court. More specifically, § 42-35-15 provides:
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions; (2) In excess of the statutory authority of the agency; (3) Made upon unlawful procedure; (4) Affected by other error of law; (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
Accordingly, when reviewing an agency's decision this Court must confine itself to a review of the record to determine if "legally competent evidence" exists to support the agency decision. Environmental Scientific Corporation v. Durfee,621 A.2d 200, 208 (R.I. 1993). "If competent evidence exists in the record considered as a whole, the court is required to uphold the agency's conclusions." Barrington School Committee v. RhodeIsland State Labor Relations Board, 608 A.2d 1126, 1138 (R.I. 1992). Legally competent evidence is defined as the presence of "some" or "any" evidence supporting the agency's findings.Sartor v. Coastal Resources Management Council, 542 A.2d 1077, 1082-83 (R.I. 1988). Thus, the Court may reverse factual conclusions of administrative agencies only when they are "totally devoid of competent evidentiary support in the record."Milardo v. Coastal Resources Management Council, 434 A.2d 266, 272 (R.I. 1981).
Questions of law decided by administrative agencies, however, are not binding on the court. Narragansett Wire Co. v. Norberg,118 R.I. 596, 607, 376 A.2d 1, 6 (1977). Therefore, this Court "may review questions of law to determine what the law is and its applicability to the facts." Chenot v. Bordeleau, 561 A.2d 891, 893 (R.I. 1989).
APPLICABLE LAW
R.I. Gen. Laws 1956 (1991 Reenactment) § 46-23-1(a) states the legislative purpose for the creation of the CRMC:
. . . to preserve, protect, develop, and, where possible, restore the State's coastal resources . . .; and that preservation and restoration of ecological systems shall be the primary guiding principle upon which environmental alteration of coastal resources will be measured, judged, and regulated.
To effectuate those goals, CRMC formulated the State of Rhode Island Coastal Resources Management Program ("CRMP"). § 200.1 of the CRMP defines Type 1 conservation areas as:
 (1) water areas that are within the boundaries of designated wildlife refuges and conservation areas,
 (2) water areas that have retained undisturbed natural habitat or maintain scenic values of unique or unusual significance, and (3) water areas that are particularly unsuitable for structures due to their exposure to severe wave action, flooding, and erosion.
The botanist/biologist team and engineer hired by Petitioners agree with the CRMC biologist that the proposed alterations involve land abutting Type 1 waters. (See Record, report of Mason/Westcott Environmental Consultants; Tr. I at 55; Record, CRMC Biologist's Report).
CRMP § 210.4 defines "coastal bank" as "the seaward face of any elevated landform directly abutting coastal waters, a beach, coastal wetland, or rocky shore." Here again, the Mason/Westcott report agrees with the CRMC biologist that the subject land is a coastal bank. (See Record, report of Mason/Westcott Environmental Consultants and CRMC Biologist's Report).
CRMP § 300.2(B)(1) lists activities that are prohibited on coastal banks adjacent to Type 1 waters, including "[f]illing, removing, or grading." § 300.2(B)(1) also provides, however, that those activities are not prohibited if "the primary purpose of the alteration is to preserve or enhance the area as a conservation area and/or natural buffer against storms." Furthermore, CRMP § 210.4(B)(3) prohibits alteration of coastal banks and contiguous areas "where such construction or alteration has a reasonable probability of causing or accelerating erosion. . . ."
SPECIAL EXCEPTION REQUIREMENT
Petitioners contend that, although the type of alteration proposed is generally prohibited on coastal banks adjacent to Type 1 waters, their proposal does not require a Special Exception because it falls within the exception in CRMP § 300.2(B)(1) as a project whose primary purpose "is to preserve or enhance the feature as a conservation area or natural buffer against storms."
Testifying in support of the application was Don Woods, an engineer from Raymond Schwabb Associates in Peacedale. Woods testified that the proposed plan included "exiting" of brush where the fill was to be laid down and cutting vegetation to a one-foot level. He further testified that a plastic device "like one of (those) plastic brillo pads" would be placed as an anchor in the topsoil layer so that "the only way that thing would fail is for the entire thing to fail at once and just the weight of the soil itself would preclude that happening." Woods said the plan also called for a double line of fence at the bottom of the slope where it abuts the wetland. (Tr. I at 51-53).
Also testifying in support of the application was Daryl Johnson, the landscape contractor who would be doing the proposed work. He said there is a problem with people using the land as a dump and that there is some erosion taking place. (Tr. I at 70-71).
The Record includes the January, 1988 letter and report from the botanist/biologist team hired by Petitioners, Mason/Westcott Environmental Consultants, in which Mason writes:
 "I regret that we were unable to find a factual basis to contest CRMC's findings on your permit application. . . . [Y]our proposed alterations are reasonable and without significant environmental impact. Unfortunately, the proposal does appear contrary to CRMC policy — but let us hope common sense will prevail in the end!"
The Mason/Westcott report states:
 "The coastal bank feature around the site shows evidence of erosion and some loss of nature trees. The dwelling does not appear to be endangered but the erosion gullys and blow downs make it unsightly and unsafe for walking. . . . The area to be filled is a steeply sloping bank vegetated principally by bitersweet. . . . The vines on the bank where the fill would be placed offer rabbit cover and provide berries for birds. . . . [T]he fill would not significantly affect wildlife values. . . . Filling and revegetation as proposed would serve to stabilize the Coastal Bank . . . and eliminate hazards of access across the site. It would not result in any adverse impacts on the coastal wetland and it would not significantly affect wildlife habitat."
The Record also includes the following: (1) a letter from John F. Delucia, of Delucia Associates, Construction Engineers 
Consultants, stating that the proposed work included "excellent erosion measures"; (2) a letter from Peter D. Ruggiero, director of city planning, in which he states no objection, but asks for careful review due to proximity to the cove's coastal features; (3) a report dated Oct. 23, 1984, written by wildlife biologist Linda Steere in which she states: "Due to the steepness of the slope and the sensitive nature of the site, if any alteration of this site was proposed it would require a Category B application to the CRMC"; (4) a letter from Edward F. Sanderson of the Historical Preservation Commission stating that the project would have no adverse effect on significant historic or archaeological properties; (5) a Notice of Comment from R.I. Statewide Planning Program stating there would be no objection provided CRMC is satisfied that the project complies with § 210.4 of the CRMP; (6) a notice of no objection from Edward S. Szymanski, chief of Division of Water Resources; (7) the preapplication report of CRMC engineer Nicholas Pisani; and, (8) the report of CRMC biologist Dennis Erkan.
Mr. Pisani testified that his report did not indicate a need for a Special Exception simply because he did not know, nor was he qualified to determine, that the embankment was indeed a coastal bank. (Tr. III at 79-80). He said that determination must be made by a biologist. (Tr. III at 79-80)
Erkan, the biologist, testified that a Special Exception would be required for the proposed alterations. (Tr. I at 72-73). He said that disturbing the coastal bank would not be justified because of the sensitivity of the wetlands. (Tr. I at 60). His report, as specifically cited by Council member Dr. Miner (Tr. I at 50-51), states:
 "[V]egetation currently found on the banks is acting as a valuable buffer against erosion, and alterations to the banks could accelerate erosion into the wetland areas and eventually into Occupasstuxet cove. It is not evident that the alterations will preserve or enhance the feature as a conservation area or a natural buffer against storms."
In support of the project, Petitioners presented the signatures of 50 neighbors. (Tr. I at 47). In addition, Mr. Campbell testified that he was concerned about people coming onto the property to dump leaves and debris and that he feared for the safety of children near the steep slope. (Tr. I at 58-59).
Mr. Creed's testimony relative to the purpose of the proposed alterations included the following:
 "to enhance the beauty of this area . . . [a]lso to reinforce the coastal bank for erosion. . . . The area now is a dense thicket of assorted weed. . . . [M]any people drive down Kristen Court . . . to view this area. . . ." (Tr. I at 47).
 "It is simply for beautification." (Tr. III at 76).
 "[T]here's a house abutting this lot that was put on the market recently for 2.5 million dollars . . . this is the kind of neighborhood we are trying to protect." (Tr. II at 87).
Petitioners' own testimony, while evidencing concern for the beauty and safety of their neighborhood, is less supportive of their contention that the primary purpose of the proposed alterations is the enhancement of the feature as a conservationarea. Moreover, the Council had before it evidence to support its findings that the proposed work would not preserve or enhance the feature as a conservation area or natural buffer against storms and would, therefore, require a Special Exception. (Decision, Findings #12 and #8).
Petitioners further challenge Finding #8, based on its phrasing:
 "8. This project requires a Special Exception for filling, removing, or grading of a coastal bank adjacent to a Type 1 water which is prohibited under the RICMP."
Petitioners contend that the wording of Finding #8 reflects the Council's erroneous view that it is the Special Exception which is prohibited to the applicants because they are individuals rather than governmental entities.
While the record does include statements by Council members that indicate confusion on the issue (Tr. III at 75, 79, 86), it is also clear that the Petitioners were allowed to apply for such an exception, that the Council held a public hearing that convened on three separate dates to consider the application, and that the chairman, prior to the vote on the issue, read the pertinent parts of § 130 so that the standard should have been clear to everyone. (Tr. III at 86-87). Although the phrasing of Finding #8 may be unartful, its meaning, when taken in context, is clear: The project would require a Special Exception for filling, removing, or grading of a coastal bank adjacent to a Type 1 water, activities which are prohibited under the CRMP.
Petitioners further argue that Finding #12 should have preceded Finding #8. It is true that in order to reach the conclusion that a Special Exception is needed one must first conclude that the project's primary purpose is not the enhancement or preservation of the feature as a conservation area or natural buffer against storms. Nonetheless, the numerical order of the Findings in the written decision does not necessarily reflect the thought process that led to those Findings. Petitioners' argument in this regard is specious and without merit.
SPECIAL EXCEPTION — BURDEN OF PROOF
CRMP § 130 provides in pertinent part:
 A. Special exceptions may be granted to prohibited activities to permit alterations and activities that do not conform with a council goal . . . or which would otherwise be prohibited by the requirements of this document only if and when the applicant has demonstrated that:
 (1) The proposed activity serves a compelling public purpose which provides benefits to the public as a whole as opposed to individual or private interests. The activity must be one or more of the following: (a) an activity associated with public infrastructure such as utility, energy, communications, transportation facilities; (b) a water-dependent activity that generates substantial economic gain to the state; and/or (c) an activity that provides access to the shore for broad segments of the public.
 (2) All reasonable steps shall be taken to minimize environmental impacts and/or use conflict.
 (3) There is no reasonable alternative means of, or location for, serving the compelling public purpose cited.
Petitioners contend that they met the burden of proof in support of their application for a Special Exception because their proposal would benefit the public at large by eliminating dumping and the danger of falling and by providing access to the shore. Petitioners further contend that, by abandoning their right to build on the land, they would be creating a valuable open space.
If, as Petitioners contend, there is a compelling public need to prevent dumping in the area and to protect people from falling, the Council had before it evidence that there is a reasonable alternative means of meeting that need: erecting a fence around the area. (See Tr. I at 72-73). If there is a compelling public need for the continuance of the area as open space, Petitioners' promise not to build is somewhat hollow, since, according to the 1984 memo of CRMC biologist Linda Steere, any building plans are subject to a Category B application for CRMC approval. (See Record, report of L. Steere).
Moreover, the proposed alteration does not meet the requirements of § 130 (A)(1). It is neither associated with public infrastructure nor is it a water-dependent activity that would generate substantial economic gain to the state. Additionally, the record indicates that, due to the geographic and philosophical positions of the Audubon Society, the proposed alteration of the coastal bank is not, nor can it be, an activity that provides access to the shore for broad segments of the public.
After a thorough review of the record, this Court finds sufficient evidence to support the March 6, 1989 decision of the Coastal Resources Management Council. Accordingly, the decision of the Council is affirmed.