DECISION
Appellants Interstate Navigation Company ("Interstate Navigation") and Interstate Nav Company ("Interstate Nav") (collectively, "Appellants") appeal from a decision of the Rhode Island Coastal Resources Management Council ("CRMC" or "Council"), granting the application of Ballards Wharf Realty, LLC f/k/a Marion C. Filippi ("Applicant") to construct a new marina to provide eight new boat slips. Jurisdiction is pursuant to G.L. 1956 § 42-35-15. *Page 2 
 I Facts and Travel
The Applicant filed an application with the CRMC on November 12, 2003 to construct a new marina to provide eight boat slips. The proposed marina is in Type 5 Commercial and Recreational Harbor Waters in Old Harbor, Block Island. Specifically, the proposed project included the construction of 150 feet of a new steel sheet-pile bulkhead and the installation of 305 linear feet of floating docks and associated tie-off pilings to support the eight slips. The application also proposed the dredging of approximately 2600 yards of marine sediment, which was to be permanently disposed on Ballard's Beach as beach nourishment. In addition, the Applicant sought several variances from the Coastal Resources Management Program Regulations (CRMP), including variances from parking, dredging, and setback requirements.
Before the CRMC held hearings to consider the Applicant's proposal, the Applicant modified the proposal in response to several requirements imposed by the Army Corps of Engineers. Among the changes that took place were limiting the first two slips to boats of no more than twenty-six feet in length and shortening the dock to twenty feet.
On February 9, 2005, CRMC Staff Engineer Danni Goulet ("Mr. Goulet") filed a pre-hearing report with CRMC Executive Director Grover Fugate. (Admin. R. at 2-8.) While Mr. Goulet deferred to the Council to determine many issues, the report did comment on several aspects of the proposal. Mr. Goulet expressed that he did not have any construction or structural concerns with the Applicant's revised proposal. Id. at 2-3. Mr. Goulet's pre-hearing report also addressed the Applicant's variance requests. With respect to the parking and dredging variances, Mr. Goulet deferred to the CRMC to determine if the Applicant met the requisite six criteria for *Page 3 
the variances. Id. at 3-4. However, Mr. Goulet had no objections or engineering concerns with the granting of the setback variance. Id. at 4. Mr. Goulet also noted that the proposed marina would be in Type 5 waters and therefore was "in keeping with the goals of maintaining a vibrant mix of port related activities including recreational boating, commercial fishing and ferries." Id. Mr. Goulet's report also expressed that the proposed dredging plan met the Council's standards, as well as industry standards for hydraulic dredging with beach nourishment disposal. Id. at 8.
CRMC Staff Biologist David Reis filed his report with Executive Director Fugate on February 18, 2004. Id. at 9-11. Mr. Reis set forth several recommendations regarding the Applicant's mitigation proposal, which addressed the destruction of eelgrass beds at the site of proposed dredging. Mr. Reis stated that "[c]onsidering the developed nature of the Type 5 water use designation of Old Harbor, [he] did not object to the proposed 8-slip marina, provided, the complete loss of the exiting eelgrass bed is replaced through an appropriate mitigation effort."Id. at 11. Mr. Reis commented that the Applicant's current mitigation proposal was insufficient, and the Council should stipulate that no work be allowed until a mitigation proposal is submitted and approved by the CRMC. Id.
On February 21, 2005, the Rhode Island Department of Environmental Management (DEM) granted Water Quality Certification to the Applicant. Id. at 12-15. The DEM opined that the project was in compliance with the Dredging Regulations and Water Regulations provided that the Applicant complied with several stated conditions, including a new eelgrass mitigation plan. Id.
Appellants Interstate Navigation and Interstate Nav filed petitions to intervene, and the CRMC granted these petitions. Interstate Navigation and Interstate Nav are individual companies that fall under the same Connecticut-based family of corporations. Interstate *Page 4 
Navigation operates the traditional and high-speed Block Island ferries from Point Judith to Old Harbor, Block Island. Interstate Nav owns the property immediately adjacent to the proposed marina and is the operator of a seasonal ferry service to New London, Connecticut. In May 2005, both Interstate Navigation and Interstate Nav submitted memoranda to the CRMC, which cited numerous safety concerns and the Applicant's failure to obtain necessary local approvals and variances.
Over the course of seven hearings between March and June 2008, the CRMC received evidence from thirteen witnesses and reviewed two depositions. The CRMC held its final meeting to discuss the proposed project on June 28, 2005. Further details of these hearings will be discussed in the sections that follow.
The CRMC issued its decision on October 28, 2005. The decision included fifty-five findings of fact. The Council approved the application by a vote of seven to one after concluding that the proposed activity did not have a reasonable probability of causing a detrimental impact upon the coastal resources of the State of Rhode Island. The CRMC's October 28, 2005 Assent required compliance with various general stipulations, as well as stipulations specific to this project.
In November 2005, Interstate Navigation and Interstate Nav filed individual appeals pursuant to Rhode Island Gen. Laws 1956 § 42-35-15(g). On February 2, 2006, this Court granted Interstate Navigation's motion to consolidate these appeals. Both Interstate Navigation and Ballards Wharf Realty have filed memoranda of law, as well as reply memoranda with this Court. The CRMC filed a response memorandum. Interstate Nav has not filed a memorandum in support of its appeal. *Page 5 
 II Standard of Review
This Court "sits as an appellate court with a limited scope of review" when reviewing the decisions of an administrative agency such as the CRMC. Mine Safety Appliance Co. v. Berry,620 A.2d 1255, 1259 (R.I. 1993). Appellate review of agency actions is governed by the Rhode Island APA, § 42-35-1, et seq. Islein v.Retirement Bd. Of Employees' Retirement System of Rhode Island,943 A.2d 1045, 1048 (R.I. 2008) (citing Rossi v. Employees'Retirement System of Rhode Island,895 A.2d 106, 109 (R.I. 2006)). The applicable standard of review codified at § 42-35-15(g) provides:
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inference, conclusions or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
"In essence, if `competent evidence exists in the record, the Superior Court is required to uphold the agency's conclusions."Auto Body Association of Rhode Island v. State of Rhode IslandDepartment of Business Regulation et al.,996 A.2d 91, 95 (R.I. 2010). Accordingly, this Court defers to the administrative agency's factual determinations provided that they are supported by legally competent evidence.Arnold v. Rhode Island Department of Labor and Training Board ofReview, 822 A.2d 164, 167 (R.I. 2003). Additionally, when examining the *Page 6 
certified record, this Court may not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. Interstate Navigation Co. v. Dis. Of Pub.Utils. Carriers of R.I., 8724 A.2d 1282, 1286 (R.I. 2003) (citations omitted).
Accordingly, this Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Baker v. Dept. ofEmployment Training Bd. Of Review, 637 A.2d 360, 363 (quotingMilardo v. Coastal Res. Mgmt. Council,434 A.2d 266, 272 (R.I. 1981)). However because most agencies are presumed to have knowledge and expertise in their respective fields, they have wide discretion in determining the weight or probative value to be given the testimony of the expert witness. Stein,Administrative Law § 28.03. In an administrative proceeding, the farther away from the mouth of the funnel that an administrative official is when he or she evaluates the adjudicative process, the more deference should be owed to the fact finder. Environmental Scientific Corp. v. Durfee,621 A.2d 200, 208 (R.I. 1993). The scope of review of the Superior Court is an extension of the administrative process. Id.
 III CMRC's Statutory Schemeand Administrative Regulations
It is the policy of the State of Rhode Island to "preserve, protect, develop and where possible, restore the coastal resources of the state for this and succeeding generations through comprehensive and coordinated long-range planning and management designed to produce the maximum benefit for society from such coastal resources . . ." Section 46-23-1. To further these ends, the General Assembly established the Coastal Resources Management Council and imbued it with the responsibility of "planning for and management of the resources of the state's coastal region." Section 46-23-6(1). Additionally, the CMRC has been granted the power to *Page 7 
"approve, modify, set conditions for, or reject any proposed development or operation within, above or beneath the tidal water. . . ." Town of Warren v. Thornton-Whitehouse,740 A.2d 1255, 1260 (R.I. 1999) (quoting § 46-23-6(2)). Given the CRMC's limited legislative power, it must confine its conduct to its expressly defined channels through which the legislature has authorized it to act.[1]
In order to act as an agent for the state, the "CRMC has been given authority to develop policies, programs and regulations that pertain to coastal areas." Strafach v. Durfee,635 A.2d 277, 279 (R.I. 1993) (citing § 46-23-6). Pursuant to the powers granted to it by the General Assembly, the CMRC has promulgated regulations under the CRMP. See CRMP. Agency regulations which are promulgated pursuant to an express grant of statutory authority, like the CRMP, have the "force of law."Henry v. Earhart, 553 A.2d. 124, 127 n. 1 (R.I. 1989) (quotingLerner v. Gill, 463 A.2d 1352, 1358 (R.I. 1983)).
CRMC "Assent" is required for any alterations or activities that are proposed for tidal waters, shoreline features, and for areas that are contiguous to shoreline features. See
CRMP § 100.1. Contiguous areas are defined as "all lands and waters directly adjoining shoreline features that extend inland two hundred (200) feet from the inland border of that shoreline feature." Id. Thus, an Assent is required for the construction of a marina. Pursuant to Section 300.4A.3 of the CRMP, "marina" is defined as any "dock, pier, wharf float, floating business, or combination of such facilities that accommodate five or more recreational boats." The Council has promulgated *Page 8 
a specific set of rules under the CRMP, establishing the procedures to be employed when an individual seeks to construct a new marina.See CRMP § 16-2-1. Applications to the CRMC, including applications for permission to construct a marina, take one of two forms: Category A or Category B. The CRMC may grant a Category A application without following the more stringent procedures which accompany consideration of a Category B request.
An applicant looking to build a marina located in a manmade shoreline is required to file a Category B application.See CRMP § 16-2-1:100. All Category B applications must go before the full Council, and the applicant must demonstrate, in writing, that all (11) requirements set forth in Section 300.1 of the CRMP are met. Once an applicant has filed a Category B application in compliance with the pertinent guidelines, a public notice is issued. See CRMP § 16-2-1. A public hearing will be scheduled if one or more substantive objections are filed within a 30-day notice period. See id. If an objection has been filed, a Council subcommittee (or full Council at the Chairman's discretion) will then review the applicant's proposal, the comments prepared by its staff, and all other pertinent materials, and will then issue a decision. CRMP § 16-2-1;see CRMP § 16-1-16:5.3(1) ("Hearings may be before a duly appointed Subcommittee or before the Council as a whole, as designated by the Chairman in his sole discretion"); seealso CRMP § 16-1-16:5.3(3) ("Upon hearing all the facts and reviewing the record in its entirety, the Council shall render its decision in accordance with Chapter 42-35 of the General Laws"). In this instance, the Chairman designated a hearing to be commenced before the Council as a whole, and not before a subcommittee.
Furthermore, Section 46-23-14 of the CRMP allows the Council to be "authorized to engage its own expert and outside consultants [,] and the council shall be empowered to use that testimony in making its decisions." The full Council's final decision must be in writing and *Page 9 
contain findings of fact and conclusions of law separately stated. CRMP § 8.1. The findings of fact must be based exclusively on the administrative record and matters officially noticed. CRMP § 8.2. The Council will base its decision on considerations of how the proposal conforms to the goals for the shoreline features and water use categories affected, other relevant policies, and the significance of the likely impacts of the proposal on the environment of the coastal region. See CRMP § 16-2-1.
 IV Review of the Council's Decision
Appellants state various grounds upon which the CRMC decision should be reversed or remanded. First, Appellants contend that the CRMC improperly relied upon evidence derived from ex parte
contacts in violation of state law. Also, Appellants contend that the CRMC's decision contains insufficient findings of fact, which are not supported by legally competent evidence in the record. Additionally, Appellants argue that the CRMC incorrectly concluded that the Applicant did not need to obtain local approvals in connection with the proposed marina. Finally, Appellants contend that the CRMC improperly granted the Applicant's parking and setback variances.[2]
 A Ex Parte Communications
Appellants argue that in reaching its decision, the CRMC improperly relied upon information provided by CRMC staff without giving Appellants prior notice or an opportunity for cross-examination. Appellants contend that the CRMC's reliance on such evidence *Page 10 
contravenes our Supreme Court's recent decision in Arnold v.Lebel. See 941 A.2d 813 (R.I. 2007). The Applicant asserts that the CRMC properly considered the disputed evidence because the evidence was on the record, and therefore, Arnold should not apply.
In Arnold, applicants of medical assistance sought to enjoin hearing officers of the Rhode Island Department of Human Services (DHS) from engaging in ex parte off-the-record communications about contested cases currently before the DHS hearing officer. 941 A.2d at 816. In its analysis, the Arnold Court expounded upon Section 42-35-13 of the Rhode Island Administrative Procedures Act (APA), which prohibits agency decision-makers from engaging in ex parte communications under certain circumstances.Id. at 820-22. Section 42-35-13 provides:
 Unless required for the disposition of ex parte matters authorized by law, members or employees of an agency assigned to render an order or to make findings of fact and conclusions of law in a contested case shall not, directly or indirectly, in connection with any issue of fact, communicate with any person or party, nor, in connection with any issue of law, with any party or his or her representative, except upon notice and opportunity for all parties to participate; but any agency member:
 (1) May communicate with other members of the agency, and
 (2) May have the aid and advice of one or more personal assistants.
The Arnold Court elucidated precisely which types of exparte communications are allowed and prohibited during the administrative adjudication of a contested case.Id. at 821. The Court stated:
 (1) § 42-35-13 of the APA prohibits ex parte communication with anyone about contested or material adjudicatory facts or opinions concerning the merits of an applicant's pending appeal. The function of this requirement is to prevent litigious facts from reaching the decision-maker off the record in an administrative hearing. *Page 11 
 (2) § 42-35-13 authorizes hearing officers to engage in ex parte communication with agency staff members about general matters pertaining to the discharge of his or her duties.
 (3) In accordance with § 42-35-9(e) and § 42-35-10(4), the hearing officer must provide notice to the parties before a hearing if he or she intends to consult any documentary source or person concerning facts or opinions about the merits of an appeal. In addition, the parties must be afforded an opportunity to contest any such evidence and to cross-examine any people consulted. This is similar to the regulations followed by many federal agencies.
 (4) All evidence that is received or considered must be on the record. This basic requirement, which facilitates judicial review, is consistent with current DHS regulations. Id.
Importantly, the Arnold Court stated that all evidence received or considered must be on the administrative record.Id. The court summarized:
 Unless the parties are given notice and an opportunity to respond on the record, including cross-examination, if appropriate, a DHS hearing officer may not communicate with anyone, including DHS staff members, about contested adjudicatory facts. . . . All facts and opinions, including opinions of agency professionals and staff, as well as information obtained from an outside source . . . must be included on the record if the hearing officer plans to base his final decision on such facts. In short, no litigious facts should reach the decision-maker off the record in an administrative hearing. . . . Id.
Thus, the Arnold Court upheld the trial justice's finding that the APA prohibits "hearing officers `from engaging in exparte communication with anyone, whether inside or outside the agency, about facts or opinions of an applicant's pending case' and requires that applicants receive notice and an opportunity to challenge all sources of evidence received or considered."Id. at 819; see also Thibaudeau v. Thibaudeau,947 A.2d 243, 246 (R.I. 2008) (finding that a hearing justice should not have referred to guardian ad litem report that was not entered into evidence); Champlin's Realty v. Tikoian,989 A.2d 427, 441-42 (R.I. 2010) (upholding a trial justice's *Page 12 
finding that an alternative plan unknown to the parties — as well as hearing officers' communications about that plan — constituted improper ex parte contacts under Arnold).
In the present case, Appellants cite various findings in the CRMC decision that purportedly demonstrate that the CRMC relied upon evidence prohibited under Arnold. Appellants contend that they were not provided notice or the opportunity to contest and cross-examine such evidence. However, the reports and testimony of Director Fugate and other CRMC staff did not constitute prohibitedex parte communications in violation of § 42-35-13. Distinct from Arnold, the testimony of Executive Director Fugate and other CRMC staff members was taken on the record at hearings where Appellants' counsel had the opportunity to contest the evidence and conduct cross-examination. Every one of the alleged Arnold
violations was conveyed to the Council on the record through written staff reports which were available prior to the hearing, were possessed by Interstate prior to the hearing, entered into the administrative record, and were presented to the Council at the hearing — on which pursuant to § 46-23-14, the CRMC is legally entitled to rely. (Goulet Dep. 1-22, March 28, 2005.) Moreover, the pre-hearing reports were provided at the hearing in compliance with42-35-10(4) and Arnold. See 941 A.2d at 820-21.
Our Supreme Court did not intend that the principles ofArnold apply to on-the-record testimony such as this. Therefore, this Court concludes that the evidence relied upon by the Council did not constitute ex parte communications under Arnold. Because all evidence considered by the Council was on the record, and Appellants were afforded the opportunity to respond on the record, this evidence was not in excess of the statutory authority of the agency and its findings were not made upon unlawful procedure. See Arnold, 941 A.2d at 820-21 *Page 13 
Appellants also dispute several of the Council's findings of fact that rely on information obtained from CRMC staff through pre-hearing staff reports, depositions, and testimony at hearings.See id. at ¶¶ 19-24, 26-27, 31. In one instance, Appellants argue that the CRMC's reliance upon the testimony of CRMC Executive Director Fugate was in violation of Arnold. (CRMC Decision at ¶¶ 8-10, 12.) The Council adopted the findings made by Executive Director Fugate, including, for example, his statement that the work associated with the bulkhead is treated as maintenance work pursuant to CRMP Section 300.14. Seeid. at ¶ 9. Other findings of fact disputed by Appellants were derived from staff reports that were readily available to Appellants in the administrative record. For example, Appellants contend that the Council improperly relied upon the CRMC's staff conclusion that the dredging standards set forth in the CRMP for the project have been met. See id. at ¶ 23. The hearing transcripts reveal that Executive Director Fugate testified on the record at several hearings that the bulkhead work was treated as maintenance work under CRMP Section 300.14. (Hr'g Tr. 83-84, March 19, 2005; Hr'g Tr. 75-76, May 3, 2005.) Similarly, the Council evidently relied on Staff Engineer Goulet's on-the-record deposition, as well his pre-hearing report, to support its finding that the CRMP's dredging standards were met. (Admin. R. at 8; Goulet Dep. 118-20, March 28, 2005.)
This Court finds that these examples of on-the-record evidence are not the types of evidence that our Supreme Court sought to guard against in Arnold. Unlike Arnold and the other cases applying these principles, Appellants have presented no competent evidence that any facts significant to this litigation reached the Council off the record. See Champlin's Realty,989 A.2d at 441; Thibaudeau, 947 A.2d at 246;Arnold, 941 A.2d at 821. *Page 14 
 B Competent Evidence
Appellants argue that the Council's factual findings are conclusory in nature and insufficient to support the CRMC's decision. Contrarily, Applicant contends that each of the Council's findings of fact is supported by competent evidence in the record.
Pursuant to G.L. 1956, § 42-35-12, the Administrative Procedures Act requires that "[f]indings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings." See Sakonnet v. Rogers,Inc., 536 A.2d 893, 896-97 (R.I. 1988); East Greenwich YachtClub v. Coastal Resources Management Council118 R.I. 559, 569, 376 A.2d 682, 687 (1977). These findings of fact set forth in an administrative agency's decision must be supported by legally competent evidence in the record. See JohnstonAmbulatory Surgical Assocs., Ltd. v. Nolan,755 A.2d 799, 805 (R.I. 2000) (quoting Barrington Sch. Comm. v.R.I. State Labor Relations Bd., 608 A.2d 1126, 1138 (R.I. 1992)).
 Safety
Appellants raised concerns over how the proposed project would impact the safety of ferry passengers and crew, patrons of the marina, users of the jetty, and patrons of Ballard's Beach. Appellants argue that the CRMC Decision ignored these dangers and included findings of fact unsupported by competent evidence in the record.
The Council made numerous findings of fact with respect to the navigation concerns expressed by Appellants. (CRMC Decision at ¶¶ 41-52.) The Council found that the evidence presented by the Applicant was more credible than the evidence presented by Appellants on the issue of whether a sufficiently safe distance existed between the proposed marina and the ferry *Page 15 
dock. Id. at ¶ 43; see Mendonsa v. Corey,495 A.2d 257, 260 (R.I. 1985) (holding that deference should be given to agency credibility determinations unless they are totally devoid of competent evidentiary support in the record). The Council recounted evidence that it heard on this issue, including evidence that high speed ferries have superior maneuverability in all conditions and evidence that there were alternative methods for motor vessel Nelseco to dock in Old Harbor, which would give it a greater safety buffer from the proposed marina.Id. at ¶¶ 47-48. The Council found that based upon the evidence presented, the distance between the ferry docking area and the proposed marina was sufficient to avoid damage, and the issues associated with jet wash from the high speed ferry would not pose a safety hazard if properly operated. Id. at ¶ 49.
It is clear that the Council's findings of fact regarding navigation safety are based upon competent evidence in the record.See Environmental Scientific,621 A.2d at 209. At the March 29, 2005 hearing, professional engineer Ronald Bourne expressed his opinion that the marina would not impact the Appellants' navigational operations. (Hr'g Tr. 137-38, March 29, 2005.) Mr. Bourne reasoned that the ferry would not be operating in the area of the proposed marina because the area was too shallow and too close to the jetty.Id. At the May 9, 2005 hearing, Captain Michael McGurl testified regarding the maneuverability of ferry vessels. (Hr'g Tr. 79-82, May 9, 2005.) Captain McGurl, who operates a high speed ferry in the Boston Harbor, was shown photographs of the Nelseco ferry weathervaning away from the dock and observed that the vessel could have maneuvered in an alternate manner, which would have allowed more room between the vessel and the jetty.Id. at 80-81. Captain McGurl also testified that when properly operated, the jet wash from the high-speed ferry would not pose a safety hazard to patrons in the marina. Id. at 69. An alternate method for docking was also suggested by Staff Engineer Mr. Goulet in his deposition. (Goulet Dep. 128-29, March 28, 2005.) *Page 16 
Appellants also argue that the CRMC did not give proper weight to evidence demonstrating the presence of navigational dangers. Appellants point to testimony like that of Captain Joseph Welch, who operates the Nelseco ferry. Captain Welch testified as to the potential for mechanical failures and the risk of running aground in the area of the new marina. (Hr'g Tr. 15-16, 18-19, April 19, 2005.) Captain Welch opined that because of the risk of mechanical failures, the proposed marina posed a safety hazard to navigation.Id. at 19-20. Appellants cite various other testimonies on the record to support their asserted safety and navigational concerns.
Despite this conflicting evidence, however, this Court finds that there was competent evidence in the record upon which the CRMC based its decision on the issue of navigational safety. SeeMendonsa v. Corey, 495 A.2d at 260. Although ample evidence was presented on both sides by competent individuals who had both engineering and maritime experience regarding the issue of navigational safety — such as the testimony of Captain McGurl, Captain Welch, and Staff Engineer Mr. Goulet — this Court may not substitute its judgment for that of the CRMC as to the weight of the evidence on questions of fact. See § 42-35-15(g). The Council clearly states that it found that the Applicant's evidence was more credible than Appellants' evidence on these issues, and this Court must given deference to that determination. (CRMC Decision at ¶ 43.)
 Homeland Security
Appellants also contend that the Council's findings of fact regarding homeland security concerns are insufficient to support the CRMC's decision. Appellants raised concerns that the *Page 17 
proposed marina would eliminate the area between the ferry dock and the jetty as a natural buffer zone and make it more difficult to detect suspicious activity.
The Council made several findings of fact with respect to the issue of homeland security. The Council found that the CRMC staff was advised by the Coast Guard that they were not going to intervene or recommend any action in the matter. (CRMC Decision at ¶ 36.) The Council based this finding on Mr. Goulet's testimony that he received an email from Commander LeBlanc of the Coast Guard, asserting that the Coast Guard had no plans to intervene. (Goulet Dep. 61, March 28, 2005.) The Council found that the presented evidence demonstrated that the concerns raised by Appellants occurred during Maritime Security (MARSEC) Level II conditions, which occur infrequently. Id. at ¶ 37. The Council also found that the evidence demonstrated that even at MARSEC Level II, access to vessels is specific to the area, vessel, and facility.Id. at ¶ 40. The Council stated that it heard conflicting testimony from various experts as to whether the proposed marina would impede or help meet new homeland security requirements set forth by the federal government. Id. at ¶¶ 38-39.
It is evident that the Council's finding was based in part on the conflicting testimony of Captain McGurl and company security officer of Interstate Navigation, William McCombe. Mr. McCombe testified that before the construction of the proposed marina, the area between the ferry dock served as a buffer zone where suspicious activity was more visible. (Hr'g Tr. 23-24, May 3, 2005.) Captain McGurl, on the other hand, expressed his opinion that the marina could actually increase homeland security as a result of the presence of tied up and signed in boats, as opposed to unidentified boats on moorings or anchors. (Hr'g Tr. 77, May 9, 2005.) The Council found that given the congested nature of Old Harbor and the existing conditions, there is *Page 18 
no detrimental impact to vessel security as a result of the proposal of purposes of the CRMP. Id. at ¶ 40.
This Court finds that the Council's findings of fact on the issue of homeland security are based on competent evidence in the record and support the CRMC's decision. See Champlin's Realty v.Tikoian, 989 A.2d at 441-42; see also Milardo,434 A.2d at 272. It is clear that the Council weighed the evidence presented by both parties and concluded that the evidence presented by the Applicant was more credible. See id. Giving deference to the CRMC's determination as to the credibility of the witnesses and the weight of the evidence pursuant to § 42-35-15(g), this Court finds that the Council's findings of fact on the issue of homeland security were based on competent evidence in the record and were not clearly erroneous. See id.
 C Local Approvals
Appellants further contend that the Applicant's failure to obtain local approvals was improperly disregarded by the CRMC. The Applicant asserts that the evidence demonstrates that local approvals were not required because, with the exception of the bulkhead work, the application did not propose any activities above the mean high water mark.
The record evidences that Executive Director Fugate advised the Council that all relevant activities associated with the proposed marina were being performed below mean high water, and therefore, in his opinion, the Applicant was not required to seek any local approvals. (Hr'g Tr. 50, March 29, 2005.) The Council adopted this finding. (CRMC Decision at ¶ 8, 10.) Marina consultant Ken Kubic also testified that all of the work to be done by the Applicant would be below the mean high water mark. (Hr'g Tr. 60, March 29, 2005.) *Page 19 
The Council also adopted Executive Director Fugate's statement that the work related to the replacement of the bulkhead was treated as "maintenance" pursuant to CRMP Section 300.14, and therefore, no applicable local approvals were required.Id. at ¶ 9, 10. Section 300.14 of the CRMP defines maintenance as: "rebuilding, reconstructing, repairing, or reestablishing to previously approved conditions and dimensions a damaged or deteriorated structure or facility." Executive Director Fugate testified at the May 3, 2005 hearing that the replacement of the bulkhead was clearly "maintenance" because it was a replacement of an existing bulkhead rather than a new construction project. In addition, the Council relied on Executive Director Fugate's testimony that, there were no applicable state or local standards related to bulkhead replacement, and thus, CRMC 300.14 was the only pertinent regulation that the Council should take under consideration. (CRMC Decision at ¶ 9; Hr'g Tr. 76, May 3, 2005.) Accordingly, the Council's decision is supported by legally competent evidence.See Milardo, 434 A.2d at 272; Hr'g Tr. 75-76, May 3, 2005.
The Council also adopted the findings of Executive Director Fugate and the Town of New Shoreham with respect to the necessity of local approval for upland parking. (CRMC Decision at ¶ 10) (stating that "all local, state, or federal ordinances must be complied with"). Executive Director Fugate and the Town of New Shoreham represented that local approval would only be required if upland parking was required or if there were infrastructure activities taking place on the upland, which the Applicant stated was not going to take place. (Hr'g Tr. 64, March 29, 2005); see Champlain'sRealty Associates L.P. v. Tillson, 2001 WL 770810, at 8
(R.I. Super., 2001). Counsel for the Town of New Shoreham testified that if it found the Applicant's activity violated zoning approvals, it would take action against the Applicant in the future.Id. However, both Executive Director Fugate and the Town of New Shoreham represented that there *Page 20 
would be no requirement of parking upland or infrastructure inland when constructing the marina. Id. (Donald Parker, the solicitor of the Town of New Shoreham, stated that: "[t]he Town's position's remains the same as the letters that are in the file" and "[the marina is] not going to require any parking or any infrastructure"). Based on these findings, by both the Town of New Shoreham and Executive Director Fugate that no upland parking or infrastructure would be required, the CRMC's conclusion that there were no applicable local approvals that were necessary to the CRMP is supported by the reliable, probative and substantial evidence of record. (CRMC Decision at ¶ 11.)
When rendering a decision, the Court remains mindful that "[a]dministrative agencies retain broad enforcement discretion and, as always, considerable deference is accorded to such agencies about how to enforce regulations." Arnold, 941 A.2d at 820-21. This Court must defer to an agency's reliance on its expertise. "It is apodictic that a reviewing court should accord an agency's decision considerable deference when that decision involves a technical question within the field of the agency's expertise."R.I. Higher Educ. Assistance Auth. v. Sec'y U.S. Dep't ofEdu., 929 F.2d 844, 857 (1st Cir. 1991) (citations omitted). This Court will only reverse factual conclusions of administrative agencies when they are "totally devoid of competent evidentiary support in the record." Bunch v. Bd. ofReview, Rhode Island Employment and Training,690 A.2d 335, 337 (R.I. 1997) (quoting Milardo, 434 A.2d at 272)).
Here, the Council's adoption of Executive Director Fugate's findings was within their statutory authority.See Section 46-23-14 ("Permitt[ing] the Council to engage their consultants when making a final decision"). Under Section 16-2-1 of the CRMP, the Council is given expansive powers to "review [the] proposal, the comments prepared by its staff, and all other pertinent materials" when rendering a decision. Here, the Council was able to take into *Page 21 
consideration the staff reports of CRMC Dredge Coordinator, Engineer Danni Goulet, and Supervising Environmental Scientist, Biologist Dave Reis, whose findings were incorporated and summarized in a recommendation given to the Council by CRMC Executive Director Grover Fugate. Additionally, the Council was provided with full hard-copies of both Engineer Goulet's and Biologist Reis's staff reports.
While the CRMC was free to disregard the recommendations made by Director Fugate, its adoption of his findings is clearly supported by adequate evidence on the record. See id. These technical questions such as the potential environmental impact of the marina and the impact of any dredging, were properly addressed and synthesized by Director Fugate for the Council's review. Seeid. Where both the Executive Director and CRMC Council reached the same conclusion after analyzing the evidence presented to them, this Court will give deference to the CRMC's decision. Seeid. Furthermore, after reviewing the record, this Court is satisfied that the CRMC's decision was based on legally competent evidence within the record. See Milardo, 434 A.2d at 272. Accordingly, this Court finds that that CRMC considered and weighed the evidence before it, and as such, gives deference to these findings. See id.
 D Variances
Appellants argue that the CRMC should not have granted the Applicant's variances because the Applicant failed to meet its burden of proof. The Applicant initially sought variances for dredging, setback, and parking requirements under the CRMP. On August 18, 2004, the Applicant submitted a letter to the Council, which addressed the criteria for each of these variance requests. (Admin. R. at 73.) *Page 22 
The Council found that that no dredging variance was necessary because there was no CRMP standard requiring that all dredging associated with a marina project is accomplished within the marina perimeter limit. (CRMC Decision at ¶ 12.) The Council based this finding on testimony from Executive Director Fugate, who stated that a dredging variance was unnecessary. (Hr'g Tr. 35, June 28, 2005.) Therefore, the CRMC determined that the Applicants needed only to obtain variances for parking and the federal channel setback pursuant to CRMP § 300.4. (CRMC Decision at ¶ 12.)
CRMP § 300.4.E.1(j) requires that a marina shall be set back three times the authorized project depth from federal channel navigation projects. With respect to the setback variance, the Council found that although the normal setback would be forty-five feet given the channel depth, the evidence demonstrated that the existing jetty was already within twenty feet of the federal channel.Id. at ¶¶ 28-29. The Council found that reports from the CRMC staff and evidence before the Council demonstrated that the Army Corps of Engineers was willing to accept the setback of twenty feet from the federal channel without any navigational concerns.Id. at ¶ 31. This finding was based on Mr. Goulet's pre-hearing report and deposition testimony, as well as testimony from marina consultant, Ken Kubic. (Admin. R. at 4.; Goulet Dep. 43-44, March 28, 2005; Hr'g Tr. 31, March 29, 2005.) Therefore, the Council ultimately found that based on the evidence before it, and notwithstanding the evidence presented by Appellants, it did not have any navigational concerns regarding the setback variance from the federal channel. (CRMC Decision at ¶ 32.); see Larue v.Registrar of Motor Vehicles, Dept. of Transp., Office of OperatorControl, 568 A.2d 755, 757 (R.I. 1990). The Council also found that the Applicant's proposed requests for the setback variance met the requisite criteria. (CRMC Decision at ¶ 53); See Larue,568 A.2d at 757. *Page 23 
CRMP § 300.4.E.1(b) requires one parking space for every 1.5 boats and one parking space for every 1.2 employees. The Council found that the evidence demonstrated that the proposed marina would be a transient marina located on an island, and the marina's patrons would typically arrive by boat and not require permanent parking.Id. at ¶ 33. The Council based this finding on the testimony of Paul Filippi, who, as owner of Ballard's Wharf Realty was familiar with the area in question. (Hr'g Tr. 97, April 19, 2005.) Mr. Filippi described the Ballard's Wharf Realty's business plan to rent only to transient boaters. Id. Thus, the Council found the evidence demonstrated that any parking associated with the project would be temporary and that there was sufficient parking within the vicinity. (CRMC Decision at ¶ 34.) The Council found that the evidence before it demonstrated that there was no parking available within the parcel to satisfy the standard set forth in the CRMP. Id. ¶ 35. The Council also found that the Applicant's proposed requests for the parking variance met the requisite criteria. Id. at ¶ 53; see Larue,568 A.2d at 757.
This Court finds that there is reliable, probative, and substantial evidence on the record to support the CRMC's grant of the Applicant's setback and parking variance requests. This Court is tasked with applying an evidentiary test which is not satisfied by "any" evidence but only that which is determined, from a review of the record, has probative force due to its competency and legality.Salve Regina College v. Zoning Board of Review of the Cityof Newport, 594 A.2d 878 (R.I. 1991) (quoting Thomas MethodistChurch v. Zoning Board of Review of Pawtucket,99 R.I. 675, 681, 210 A.2d 138, 142 (1962).
In this case, the Council considered the testimonial evidence of Mr. Filippi, who has extensive knowledge of the property in question, the business plan of Ballard's Wharf Realty, and the parking in the area, due to his ownership interest in Ballard's Wharf Realty. As such, the *Page 24 
CRMC's decision demonstrates that the Council considered competent evidence in the record, to support its findings of fact.
 IV Conclusion
After a review of the entire record, this Court finds that the CRMC's decision to grant Ballard Wharf Realty, LLC f/k/a Marion C. Filippi's application to construct a new marina providing eight new boat slips, is not affected by error of law and does not exceed the CRMC's statutory authority. The CRMC's decision is not clearly erroneous in view of the reliable, probative, and substantial evidence of record. Additionally, this Court finds that the CRMC's decision is not arbitrary or capricious or characterized by abuse of discretion, or an unwarranted exercise of the CRMC's discretion. The substantial rights of the Appellants have not been prejudiced.
For the foregoing reasons, the decision of the CRMC dated October 28, 2005, which granted Ballard Wharf Realty, LLC f/k/a Marion C. Filippi's application to build a new marina providing for eight new boat slips, is affirmed. Counsel shall confer and submit forthwith an agreed upon form of order and judgment that is consistent with this Decision.
[1] The Rhode Island Supreme Court has issued a decision that effectively renders the current CRMC unconstitutional because it is made up of members appointed by the General Assembly. In reRequest for Advisory Opinion from the House of Representatives(Coastal Resources Management Council),961 A.2d 930, 942 n. 18 (R.I. 2008). This decision does not affect the validity of past CRMC administrative actions and determinations. To do so would "substantially disrupt governmental programs and functions." Id.
[2] Appellants also argue that the construction of the marina infringes upon Appellants' riparian rights. The riparian rights dispute between these parties is currently before the Rhode Island Superior Court in a separate action. Therefore, this Court will not address this issue.