June 24, 2019

**Supreme Court**

No. 2015-328-M.P.
(PC 14-1339)

Rollingwood Acres, Inc. et al.        :

v.        :

Rhode Island Department of Environmental    :
Management et al.

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Rollingwood Acres, Inc. et al.          :

v.                                      :

Rhode Island Department of Environmental    :
          Management et al.


Present: Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.** Rollingwood Acres, Inc. (Rollingwood), Smithfield

Peat Co., Inc. (Smithfield Peat), and Smithfield Crushing Co., LLC (Smithfield Crushing)

(collectively, plaintiffs) appealed from a Notice of Violation (NOV) issued on November 6, 2006

by the Rhode Island Department of Environmental Management (DEM). The NOV alleged ten

discrete violations of the Rhode Island Water Pollution Act, DEM's Water Quality Regulations,

the Rhode Island Oil Pollution Control Act, DEM's Oil Pollution Control Regulations, and DEM's

Regulations for the Rhode Island Pollution Discharge Elimination System. After a hearing before

the Administrative Adjudication Division of DEM (AAD), the plaintiffs prevailed on all but two

of the alleged violations. The plaintiffs requested reasonable litigation expenses under the Equal

Access to Justice for Small Businesses and Individuals Act, G.L. 1956 chapter 92 of title 42

(EAJA). The AAD hearing officer denied their request, finding that DEM's "decision to initiate

and proceed with the enforcement action was based on substantial justification" within the

meaning of EAJA. The plaintiffs appealed to the Superior Court under the Administrative

Procedures Act, G.L. 1956 chapter 35 of title 42 (APA), which upheld the AAD's denial of

reasonable litigation expenses. The plaintiffs then filed a petition for the issuance of writ of

certiorari, seeking this Court's review of the Superior Court's decision, which we granted. For the reasons set forth in this opinion, we quash the judgment of the Superior Court.

## I

## Facts and Travel

This case has a protracted history dating back to the 1980s. The facts of the case have been recounted many times throughout the various administrative and Superior Court decisions; therefore, we include only details relevant to the case before us now.

## A

## Permit Issuance

Rollingwood is the record owner of property located at 961 Douglas Pike, Route 7, in Smithfield (the property). Smithfield Peat operates a leaf and yard waste composting facility at the property and is registered with the United States Environmental Protection Agency (EPA) as a hazardous waste generator. Smithfield Crushing operates a rock crushing facility at the property.[1]

In May 1982, DEM issued a freshwater wetlands permit to Smithfield Peat. The permit authorized Smithfield Peat to alter freshwater wetlands by excavating, filling, and grading within fifty feet of an unnamed swamp to remove peat, construct two stormwater detention basins, install a sewer line, and construct a road. In accordance with the permit, Smithfield Peat was required to use fifteen-inch-diameter discharge pipes as part of its stormwater detention basins. The plaintiffs spent over $100,000 and two years constructing the authorized drainage structure.

---

[1] All three entities list their principal place of business as 295 Washington Highway, Smithfield, Rhode Island. Jackson Despres is the Vice President of Rollingwood, President of Smithfield Peat, and Managing Member of Smithfield Crushing.

**B**

**Complaint and Initial Inspections**

From 1996 through 1997, the Rhode Island Department of Transportation (DOT) carried out a project to improve Route 7. Part of this project was located along Rollingwood's property. Without plaintiffs' knowledge and without seeking a permit from DEM, DOT replaced plaintiffs' fifteen-inch-diameter pipe with an eighteen-inch-diameter pipe. The plaintiffs discovered the larger pipe only after DOT had finished its project. The larger pipe resulted in the drainage system's increased discharge of turbid, or sediment-laden, water into a stream.

To add insult to injury, on December 3, 1996, a DOT employee filed a complaint with DEM stating that plaintiffs' drainage structure was discharging turbid water into a stream. As a result, DEM, through its Office of Compliance and Inspection (OC&I), made two site inspections in January 1997. Sean Carney, a site inspector, observed a "discharge of sediment into a stream in non-conformity with the permit letter * * * ." DEM concluded that the sediment was discharging from plaintiffs' detention basin and that the Route 7 project had also contributed to unpermitted discharge levels. On June 3, 1997, DEM issued a Notice of Intent to Enforce (NOIE) to plaintiffs, which required remediation of the drainage structure. The plaintiffs apparently took no action in response to the NOIE, nor did DEM seek to enforce the NOIE; however, DEM's case file on this matter remained open.

**C**

**Follow-Up Investigations and Discovery of the Oil Pollution Violations**

Over eight years later, DEM revisited the property on February 9, 2005, when Peter Naumann, a DEM site inspector, was investigating another complaint in the area. During that inspection, Naumann noticed an "oily sheen" in one of plaintiffs' retention ponds, which caused

him to suspect an oil spill. Naumann quickly notified plaintiffs and DEM Emergency Response. The plaintiffs immediately secured Lincoln Environmental, Inc. for remedial work, which, within hours, began containing and cleaning up the oil discharge.

On February 10, 2005, Naumann returned to the property for follow-up testing of the oil spill and runoff water. He collected five water samples for a variety of tests, including turbidity and hydrocarbon presence. Four of the water samples were taken from the water on the property or downstream of the property, and one background sample was taken from a nearby, but unconnected, stream. The samples revealed the presence of hydrocarbons, which indicated that a petroleum product had been released on the property. The plaintiffs determined that the oil source came from a pile of stone and waste rock that Smithfield Peat had recently obtained from the Narragansett Bay Commission Combined Sewer Overflow Tunnel project.

On April 4, 2006, Patrick Hogan, another DEM site inspector, returned to take additional water samples because the 2005 background sample, taken from an unconnected stream, could not be used. Again, Hogan observed the discharge water's turbidity. Hogan could not find an appropriate upstream sample, and later testified that he was unable to do so because "[t]here is no upstream with this location * * * [t]he water seems to begin right there." Due to the lack of a suitable upstream location to take a sample, Hogan collected a sample roughly 1,500 feet downstream from the discharge to function as DEM's background sample.

**D**

**DEM's Issuance of a Notice of Violation and Plaintiffs' Administrative Appeal**

On November 6, 2006, DEM issued an NOV against plaintiffs, and assessed an administrative penalty of $31,470. The NOV charged plaintiffs with violations of the Rhode Island Water Pollution Act, DEM's Water Quality Regulations, the Rhode Island Oil Pollution Control

Act, DEM's Oil Pollution Control Regulations, and DEM's Regulations for the Rhode Island Pollution Discharge Elimination System.

The plaintiffs appealed the NOV to AAD. Five years later, an AAD hearing officer conducted an extensive administrative hearing, with six days of testimony from nine witnesses over the course of five months in late 2011 and early 2012. During the course of the hearing, plaintiffs filed a motion to dismiss for failure to join DOT as an indispensable party, which was denied before the end of the hearing.[2]

The AAD hearing officer issued a comprehensive decision on June 27, 2012 (Merits Decision). Finding that DEM had not met its burden of proof by a preponderance of the evidence to support most of the violations, the hearing officer dismissed all but two violations. The water pollution violations were dismissed for lack of a valid background sample. The hearing officer found that the water samples "were not taken in accordance with the Water Quality Regulations and are of no use in proving a turbidity violation by [DEM]." "Without a valid upstream sample[,]" the hearing officer noted, "all of [DEM's] samples and testing on turbidity are meaningless."

---

[2] We note this action because of plaintiffs' repeated insistence that DOT was to blame. On December 6, 2011, at the end of DEM's direct case, plaintiffs filed a motion to dismiss for failure to join an indispensable party. The plaintiffs argued that the evidence in DEM's case established that DOT was an indispensable party to the pending appeal. In his decision and order, the hearing officer recognized that the testimony and documentary evidence showed that, before DOT's project, plaintiffs' drainage system was properly permitted and properly operating. The evidence showed that it was, indeed, DOT's removal of the fifteen-inch-diameter pipe and replacement with the eighteen-inch-diameter pipe that caused the turbidity. The hearing officer, however, citing to *Root v. Providence Water Supply Board*, 850 A.2d 94 (R.I. 2004) (discussing whether complete relief can be afforded in the absence of the indispensable party), asked: "Can complete relief be granted in the absence of [DOT] as a party?" He stated that although it was "clear that [DOT] could have been cited" for its violations, and that he was "troubled" by DOT's removal of a properly permitted, properly functioning drainage system without seeking DEM approval, he did not find DOT to be an indispensable party because relief could be afforded to plaintiffs without DOT. The hearing officer further stated that plaintiffs' evidence regarding DOT's involvement sounded more like a defense to the water pollution charges.

David Chopy, director of OC&I, testified at the administrative hearing about DEM's decision to issue turbidity-related violations to plaintiffs rather than to DOT. He testified, according to the Merits Decision, that "he didn't know who changed the drainage system but assumed that [plaintiffs], as owners of the property, had either made the change [to the drainage system] or consented to it." He further testified, the Merits Decision states, that "he didn't have any other facts or information" that would indicate that plaintiffs were responsible for the change to the authorized drainage system. In the Merits Decision, the hearing officer noted that "[w]hen asked if [Chopy] read the notes to file [on DOT's involvement] Chopy's response very often was that he probably read the notes but didn't recall." The hearing officer stated: "After hearing all the evidence on the issue of turbidity, it is clear that [plaintiffs] were victimized by [DOT]. Instead of following up and holding [DOT] responsible for its involvement in this matter [DEM] charged [plaintiffs] only."

In dismissing two of the alleged oil pollution violations, the hearing officer at the outset noted that these violations are "separate and apart" from the water pollution violations. He found that plaintiffs were not aware of the oil discharge, thus they were not liable to DEM for failure to immediately notify it of the release, and that, once aware, plaintiffs immediately initiated remediation on the property, and thereby were not liable for failure to immediately clean the oil discharge. The hearing officer did find that plaintiffs received product contaminated with oil and were therefore responsible for the oil discharge into waters of the state under a strict liability theory. The hearing officer reduced the administrative penalty from $31,470 to $2,615. When explaining his decision to do so, the hearing officer noted that Chopy had testified that he had assessed the warranted monetary penalty for plaintiffs' violation as "moderate" rather than

"minor"—not because of any factors in the Administrative Penalty matrix,[3] but simply because Smithfield Peat was a registered small-quantity generator with oil and he would expect its employees to be familiar with oil releases.

Both parties timely appealed the hearing officer's Merits Decision to the Superior Court, and both appeals were ultimately dismissed.

## E

### EAJA Request

On July 27, 2012, plaintiffs filed a request for litigation expenses under the EAJA and Rule 1.20 of DEM's AAD Rules and Regulations, 250 R.I. Code R. § 10-00-1.20.[4] Finding that plaintiffs were not "parties" under the EAJA, the hearing officer denied plaintiffs' request. The plaintiffs appealed that decision to the Superior Court. The Superior Court found plaintiffs to be

---

[3] The DEM Rules and Regulations for Assessment of Administrative Penalties for Compliance and Inspection, 250 R.I. Code R. ch. 130, provides for the calculation of administrative penalties. Section 130-00-1.10 sets out the factors DEM will consider when calculating "the degree to which the violation is out of compliance with the legal requirement allegedly violated." 250 R.I. Code R. § 130-00-1.10(A)(1)(b). Those factors include:

> "(1) The extent to which the act or failure to act was out of compliance;
> "(2) Environmental conditions;
> "(3) The amount of the pollutant;
> "(4) The toxicity or nature of the pollutant;
> "(5) The duration of the violation;
> "(6) The areal extent of the violation;
> "(7) Whether the person took reasonable and appropriate steps to prevent and/or mitigate the non-compliance;
> " * * *
> "(9) The degree of willfulness or negligence, including but not limited to, how much control the violator had over the occurrence of the violation and whether the violation was foreseeable[.]" *Id.*

[4] General Laws 1956 § 42-92-4 of the EAJA requires agencies that are authorized to conduct adjudicatory proceedings to "establish uniform procedures for the submission and consideration of applications for an award[.]" Accordingly, 250 R.I. Code R. 10-00-1.20 is DEM's regulatory procedure related to filing for the recovery of litigation expenses under the EAJA. *See infra* footnotes 8 and 9 for the pertinent text of Rule 10-00-1.20.

"parties" under the EAJA and remanded the case to AAD to consider the merits of plaintiffs' claim for litigation expenses.

On February 28, 2014, in considering the substantive claim for litigation expenses, the hearing officer denied plaintiffs' request, finding that DEM had acted with substantial justification (AAD EAJA Denial). Recognizing that most of the charges against plaintiffs had been dismissed, the hearing officer nonetheless found that DEM was substantially justified both in initiating the investigation as a response to a complaint and in pursuing the NOV. The plaintiffs appealed to the Superior Court on March 14, 2014.

**F**

**Superior Court Decision**

The Superior Court set a briefing schedule, and plaintiffs and defendants filed memoranda on the AAD EAJA Denial. On December 15, 2014, the trial justice issued her decision upholding the AAD EAJA Denial. The plaintiffs filed a motion to reconsider on June 18, 2015, which was heard and denied on September 10, 2015. Final judgment entered on October 9, 2015. The plaintiffs filed a petition for writ of certiorari with this Court seeking our review, which we granted.

**II**

**Statutory Framework**

As this is the first opportunity we have had to review a fee determination initially awarded or denied under § 42-92-3(a), we are mindful of the stated purpose of the EAJA:

> "It is declared that both the state and its municipalities and their respective various agencies possess a tremendous power in their ability to affect the individuals and businesses they regulate or otherwise affect directly. * * * Therefore, in order to encourage individuals and small businesses to contest unjust actions by the state and/or municipal agencies, the legislature hereby declares that the financial burden borne by these individuals and small businesses should be, in all fairness, subject to state and/or municipal

reimbursement of reasonable litigation expenses when the individual or small business prevails in contesting an agency action, which was without substantial justification." Section 42-92-1(a) and (b).

The EAJA is a remedial statute which we are bound to read expansively to effectuate its stated purpose of reimbursing reasonable litigation expenses when contesting "unjust actions by the state[.]" Section 42-92-1(b). That is significant in this case because the actions at issue were perpetrated by two state agencies, only one of which is a party to this litigation.

The EAJA sets forth two procedural avenues, one for each of the fora in which the initial fee determination may be made: the agency or the court. *See Tarbox v. Zoning Board of Review of Town of Jamestown*, 142 A.3d 191, 196-97 (R.I. 2016). The first path occurs when a party is successful on the underlying merits at the agency level. Section 42-92-3(a) provides that "the adjudicative officer shall award to a prevailing party reasonable litigation expenses incurred by the party in connection with that proceeding" unless the officer "finds that the agency was substantially justified in actions leading to the proceedings and in the proceeding itself." Notably, § 42-92-3(a) explicitly prohibits any other agency official from reviewing the EAJA award. If a party is "dissatisfied with the fee determination by the adjudicatory officer," he or she may appeal, under § 42-92-5, "to the court having jurisdiction to review the merits of the underlying decision of the agency adversary adjudication." Section 42-92-5; *see also Tarbox*, 142 A.3d at 197. The statute further provides for "a de novo review of the record" by the court. *Id.*

The second scenario, with which we are not confronted in this matter, occurs under § 42-92-3(b). In such a case, a party receives an unfavorable decision on the underlying merits at the administrative level and then appeals to the appropriate court. *See Tarbox*, 142 A.3d at 196-97. If the court reviews the underlying agency decision and the party is successful in the appeal, "an award for fees and other expenses shall be made by that court[.]" Section 42-92-3(b).

- 9 -

Either way, whether a party may recoup litigation expenses hinges on whether the administrative agency was substantially justified in its actions. *See* § 42-92-3. An agency is substantially justified when "the initial position of the agency, as well as the agency's position in the proceedings, ha[d] a reasonable basis in law and fact." Section 42-92-2(7). This Court has previously commented that, pursuant to the EAJA substantial justification test, the state "must show not merely that its position was marginally reasonable; its position must be clearly reasonable, well founded in law and fact, solid though not necessarily correct." *Taft v. Pare*, 536 A.2d 888, 893 (R.I. 1988) (quoting *United States v. 1,378.65 Acres of Land*, 794 F.2d 1313, 1318 (8th Cir. 1986)) (expressly adopting the Eighth Circuit's standard of interpretation).

Notably, the substantial justification question "will not be precisely the same as the merits[,]" rather it is "what the Government was substantially justified in believing [the law] to have been." *Pierce v. Underwood*, 487 U.S. 552, 561 (1988) (analyzing 28 U.S.C. § 2412, the federal equivalent of the EAJA).[5] When considering the EAJA request, the court "reexamine[s] the legal and factual circumstances of the case from a different perspective than that used at any other stage of the proceeding[.]" *United States v. Hallmark Construction Co.*, 200 F.3d 1076, 1080 (7th Cir. 2000). In doing so, the court "look[s] at the merits of the underlying action to determine if the government's position is justified." *Oregon Natural Resources Council v. Madigan*, 980 F.2d 1330, 1331 (9th Cir. 1992). A substantial justification analysis often requires a review of the record of the underlying merits decision to evaluate whether an agency's position initially was and remained justified. *See, e.g.*, *id.* at 1331-32; *Kali v. Bowen*, 854 F.2d 329, 332 (9th Cir. 1988);

---

[5] Rhode Island's EAJA is modeled on the federal EAJA, 28 U.S.C. § 2412. *Krikorian v. Rhode Island Department of Human Services*, 606 A.2d 671, 674 (R.I. 1992). Accordingly, we may turn to federal caselaw for guidance. *Id.* ("When a Rhode Island statute is modeled on a federal statute, this [c]ourt 'should follow the construction put on it by the federal courts, unless there is strong reason to do otherwise.'") (quoting *Laliberte v. Providence Redevelopment Agency*, 109 R.I. 565, 575, 288 A.2d 502, 508 (1972)).

*Tarbox*, 142 A.3d at 198; *Krikorian v. Rhode Island Department of Human Services*, 606 A.2d 671, 676 (R.I. 1992). To be sure, this Court has previously acknowledged that "any appeal from the grant or denial of a request for reasonable litigation expenses is necessarily intertwined with the agency decision"; such a request "cannot be divorced from the underlying agency action." *Tarbox*, 142 A.3d at 198. We further emphasized that "any attempt to separate a request for reasonable litigation expenses under the act from review of the underlying agency decision is wholly artificial." *Id.*

## III

### Standard of Review

"We review the trial justice's denial of the motion for reasonable litigation expenses under the [EAJA], as a question of law, *de novo*." *Campbell v. Tiverton Zoning Board*, 15 A.3d 1015, 1024 (R.I. 2011). Because the question of fee determination is "necessarily intertwined with the [underlying] agency decision[,]" *Tarbox*, 142 A.3d at 198, we accord deference to the findings of fact in the agency's decision. *See Pierce*, 487 U.S. at 559.

As the trial justice noted, the statutory scheme of the EAJA creates an apparent conflict concerning the scope of judicial review of the fee determination by the adjudicatory officer. Section 42-92-5 permits the court to modify the fee determination "upon a de novo review of the record." Section 42-92-7, however, clarifies that the EAJA "is intended to supplement the provisions of" the APA, and that the APA controls in the event of any conflict between the two. The APA provides for a deferential standard of review:

> "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

"(1) In violation of constitutional or statutory provisions;

"(2) In excess of the statutory authority of the agency;

"(3) Made upon unlawful procedure;

"(4) Affected by other error or law;

"(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

"(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Section 42-35-15(g).

To reconcile this seeming conflict, the trial justice appropriately turned to this Court's analysis in *Environmental Scientific Corp. v. Durfee*, 621 A.2d 200 (R.I. 1993), wherein we held that an appellate tribunal must defer to the evidentiary findings of an administrative hearing officer when credibility evaluations are implicated. *Durfee*, 621 A.2d at 206. "The [hearing officer's] impressions as he or she observes a witness and listens to testimony 'are all important to the evidence sifting which precedes a determination of what to accept and what to disregard.'" *Id.* (quoting *Laganiere v. Bonte Spinning Co.*, 103 R.I. 191, 196, 236 A.2d 256, 258 (1967)).

Here, the hearing officer conducted an extensive hearing on the underlying merits of DEM's NOV, encompassing at least six separate dates, during which nine witnesses testified. At the conclusion of the hearing, the hearing officer made sixty-nine specific findings of fact, in addition to his analysis of the evidence, all of which implicate his assessment of the witnesses' credibility. We are satisfied that those findings were entitled to deference by the Superior Court. We therefore will proceed to give deference to the findings of facts, but review questions of law *de novo*. *See Durfee*, 621 A.2d at 206.

## Discussion

First, plaintiffs argue that the trial justice and hearing officer erred in concluding that DEM was "*per se*" substantially justified because the initial complaint, filed in 1996, was not cited as a basis for issuing the NOV, filed in 2006.[6]  DEM maintains that it was substantially justified because it was investigating a complaint, acting under its statutory authority and duty.  DEM notes that the file opened when the NOIE issued in 1997 and had never been closed, and that, often, one complaint leads to the next.

Second, plaintiffs argue that DEM was not substantially justified leading up to the filing of the NOV as well as throughout the adjudicatory proceedings.  The plaintiffs maintain that DEM should have issued the NOV to DOT—and not plaintiffs—because of the evidence demonstrated at the underlying adjudicatory proceeding, particularly with respect to the replacement of their fifteen-inch-diameter pipe with DOT's eighteen-inch-diameter pipe.  The plaintiffs also argue that DEM improperly issued the NOV based on water samples DEM knew could not support a legally-viable claim.  Last, plaintiffs contend that DEM had no basis to issue the two dismissed oil violations.

DEM counters that it had a reasonable basis to believe plaintiffs were culpable in, or had knowledge of, the drainage alteration.  DEM points out that DOT's involvement has no bearing on whether DEM was substantially justified in bringing action against plaintiffs.  Moreover, DEM argues that it is not required to issue NOVs to every potentially responsible party.  In response to the failure to include an upstream water sample, DEM argues that the choice of the background

---

[6] The trial justice, hearing officer, and parties refer to a situation where an investigation is initiated by a complaint that the agency is statutorily charged with investigating as "*per se*" substantial justification.

water sample was one based on DEM's technical expertise and a reasonable interpretation of the regulation given the surrounding circumstances. Finally, DEM maintains that it was justified in issuing the two oil pollution violations—plaintiffs' alleged failure to immediately respond to the oil discharge and failure to immediately report the violation to DEM—because DEM had reason to believe plaintiffs were aware of the oil discharge before DEM notified plaintiffs of it.

## A

## Administrative Decision

This case comes to us under § 42-92-3(a) and § 42-92-5, where both the underlying decision on the merits and fee determination were initially made at the agency level. Because the hearing officer relied on the Merits Decision's factual findings in his AAD EAJA Denial, a brief summary of the pertinent portions of the Merits Decision provides the backdrop for our review.[7] With respect to the issue of turbidity, the hearing officer starkly concluded that plaintiffs were "victimized" by DOT, and that DEM, "[i]nstead of following up and holding [DOT] responsible for its involvement[,]" charged only plaintiffs. In support of his conclusion, the hearing officer referenced several "notes to file" submitted by DEM reflecting DEM's awareness that DOT was involved in the installation of the unauthorized eighteen-inch-diameter pipe. Carney testified that DOT promised a letter explaining its involvement, but the letter never came.

The hearing officer further noted a letter to DOT from Harold Ellis, the Supervisor of the Wetlands Compliance Section of OC&I, in which Ellis indicated that DEM had been advised that the original fifteen-inch-diameter pipe had been replaced as part of the Route 7 reconstruction project carried out by DOT. Ellis requested a response from DOT as to how the matter might be

---

[7] We rely on the facts in the Merits Decision because we find it to include sufficient details as to the evidence that DEM had before it when it decided to issue the NOV against plaintiffs. We recognize that not all administrative hearings on the underlying merits will be as illuminative and as helpful.

- 14 -

resolved, but again DOT never responded. This correspondence from Ellis was the last action taken by DEM until Naumann's site inspection several years later in 2005. Significantly, the hearing officer found that Naumann's "visit was not the result of a complaint but a follow up inspection while he was in the area on another complaint."

The NOV with respect to turbidity was issued by DEM on November 6, 2006. Chopy testified about DEM's decision to charge plaintiffs with the violations relating to turbidity. According to the Merits Decision, he said that he did not know who had changed the drainage system "but assumed that [plaintiffs], as owners of the property, had either made the change or consented to it." When asked if he had read the numerous notes and correspondence indicating that DOT "bore some or all of the responsibility[,]" his response often was that he probably had read them but did not recall. The hearing officer allowed that "it is quite possible that Mr. Chopy did not see all the evidence pointing to [DOT's] involvement in this matter[,]" but he also noted Chopy's acknowledgment that DOT "often violate[s] environmental laws and regulations[.]"

The hearing officer, in the Merits Decision, ultimately concluded that DEM had not sustained its burden of proof that plaintiffs had caused the increased sediment discharge and that "the changes made to [plaintiffs'] drainage system were done by [DOT] without [plaintiffs'] knowledge or consent."

In light of these facts, when deciding plaintiffs' EAJA request, the hearing officer nonetheless concluded that DEM was substantially justified in initiating and pursuing its actions against plaintiffs. The hearing officer first determined that DEM was entitled to substantial justification because the underlying actions leading to and throughout the proceedings of the Merits Decision were initiated by the December 3, 1996 complaint filed by a DOT employee. The

hearing officer continued to find that, even without the complaint, DEM was substantially justified because turbid water had been found emanating from plaintiffs' property.

**B**

**Superior Court Decision**

In her decision, the Superior Court justice adopted the hearing officer's determination that DEM was substantially justified because a complaint had initiated DEM's actions. The trial justice likewise found DEM's actions were substantially justified even if it was not acting in response to a complaint. She reviewed the evidence in the Merits Decision regarding DOT's involvement and found that, during the proceedings, DEM "had reason to believe that [plaintiffs] were at least partially involved in the alteration of the drainage structure." The trial justice found DEM's actions rational "in determining that the owners of the [p]roperty were the reasonable parties for altering the drainage."

**C**

**Substantial Justification**

**1**

The EAJA provides, in pertinent part, that "[a]ny agency charged by statute with investigating complaints shall be deemed to have substantial justification for the investigation and for the proceedings subsequent to the investigation." Section 42-92-2(2). Pursuant to G.L. 1956 chapter 17.1 of title 42, DEM is such an agency charged by statute with investigating complaints:

> "The director of environmental management shall have the following powers and duties:
>
> "To issue and enforce such rules, regulations, and orders as may be necessary to carry out the duties assigned to the director and the department by any provision of law; and to conduct such investigations and hearings and to issue, suspend, and revoke such

- 16 -

licenses as may be necessary to enforce those rules, regulations, and orders." Section 42-17.1-2(19).

Section 42-92-4 of the EAJA instructs that "[a]ny agency authorized to conduct an adjudicatory proceeding shall, by rule, establish uniform procedures for the submission and consideration of applications for an award under this section." Accordingly, DEM promulgated rules to comply with the EAJA's mandate. *See* 250 R.I. Code R. § 10-00-1.20.[8] Those rules state that a hearing officer "shall deny an award of litigation expenses to the petitioner if * * * the Division was charged by statute with investigating a complaint, which led to the adjudicatory proceeding." 250 R.I. Code R. § 10-00-1.20(F)(2)(c).[9]

---

[8] In full, Rule 1.20(A) states: "The purpose of this rule is to carry out the statutory requirements contained in the [EAJA] which provides for the award of reasonable litigation expenses to prevailing parties in certain adjudicatory proceedings conducted by state agencies." 250 R.I. Code R. § 10-00-1.20(A).

[9] In full, Rule 1.20(F) states:
> "1. Except as provided in § 1.20(F)(2) of this Part, the [hearing officer] shall award reasonable litigation expenses to the petitioner if he or she finds that the record in the case establishes by a preponderance of the evidence:
> > "a. That the petitioner is a party as defined in the R.I. Gen. Laws § 42-92-2(a);
> > "b. That the respondent has prevailed against the Division in the underlying adjudicatory proceeding;
> > "c. That the Department instituted the underlying adjudicatory proceeding without substantial justification; and,
> > "d. The amount of reasonable litigation expenses as defined in R.I. Gen. Laws § 42-92-2(c) which may include a recalculation of the expenses and a finding that some or all of the litigation expenses qualify as reasonable litigation expenses under the statute.
> "2. The [hearing officer] shall deny an award of litigation expenses to the petitioner if:
> > "a. The petitioner failed to meet the burden of proof established in § 1.20(F)(1) of this Part;
> > "b. The Division was substantially justified in the actions leading to the proceedings and in the proceeding itself; or,
> > "c. The Division was charged by statute with investigating a complaint, which led to the adjudicatory proceeding.
> > "d. The [hearing officer] may, at his or her discretion, deny fees or expenses if special circumstances make an award unjust." 250 R.I. Code R. § 10-00-1.20(F).

While we recognize DEM's authority to investigate complaints, the initial complaint in this case was filed in 1996. DEM did not issue an NOV until 2006. Its preliminary investigation into the cause of the turbid water seemed to dwindle to nothing; yet, had DEM followed up on its investigation, it may well have included DOT as a party to the alleged violation. In the Merits Decision, the hearing officer referenced Chopy's testimony that DOT "has a history of not complying with wetlands statutes and water quality statutes[,]" and that DEM "has issued dozens and dozens of NOVs and informal notices" against DOT for various offenses. Chopy further testified that DEM "attempted to investigate the involvement of [DOT] but never got a satisfactory response." According to the hearing officer, Chopy "said that if they had issued a[n] NOV to [DOT] that they would have got to the bottom of it." As the hearing officer ultimately concluded, DEM knew or should have known of DOT's involvement. Moreover, DEM only revived its action against plaintiffs when a DEM site inspector visited the property as "a follow up inspection while he was in the area on another complaint."

Under these circumstances, we are not satisfied that there is a sufficient nexus between the original complaint in 1996 and the NOV issued in 2006 to entitle DEM to the shield that it was substantially justified in initiating and pursuing the administrative proceedings against plaintiffs. Therefore, DEM's actions did not warrant the blanket protection of substantial justification afforded by § 42-92-2(2) and Rule 1.20(F)(2)(c).

**2**

The trial justice also found that, even if the NOV was not the direct result of a complaint, DEM's actions were nonetheless substantially justified. The trial justice reviewed the evidence surrounding the water samples and found that "DEM's investigation was not rendered unreasonable by the lack of adequate background samples." Deferring to the expertise and on-the-

spot judgment required by the site investigator at the time, the trial justice concluded that, although the hearing officer was correct in determining that the lack of a valid background sample rendered the water samples "meaningless" at the adjudicatory hearing, the lack of a valid background sample did not render DEM's investigation "unreasonable." Finally, regarding the oil pollution violations, the trial justice concluded that DEM had a reasonable basis to believe that plaintiffs would have known about an oil discharge before DEM's discovery, particularly in light of Smithfield Peat's registration as a small-quantity generator of oil with the EPA.

Before this Court, plaintiffs argue that (1) at the time the NOV was filed, DEM knew and had evidence that DOT was responsible for the pipe exchange which caused turbid water to discharge; (2) DEM improperly issued the NOV against plaintiffs based on water samples it knew could not support a legally viable claim; and (3) DEM had no basis to issue the two dismissed oil pollution violations.

DEM argues that DOT's culpability is irrelevant to the substantial justification inquiry, and that, while DEM knew DOT was involved, DEM believed plaintiffs were also at fault. Moreover, DEM argues that it is not required to issue NOVs to every potentially responsible party. For example, as evidence of DEM's belief that plaintiffs, too, might be responsible, DEM points to testimony by Chopy that he was not aware DOT had replaced pipes on private property without the landowner's consent. DEM essentially argues that, because turbid water was discharging from plaintiffs' property, it was justified in issuing the NOV to plaintiffs.

This argument, however, glosses over what scant evidence DEM had at the time it issued the NOV about both plaintiffs' and DOT's involvement. DEM was aware that DOT had a history of ignoring environmental regulations. Chopy provided testimony that DEM issued the NOV not because they had evidence that any of plaintiffs were responsible for the pipe change, but because

Rollingwood was owner of the property.[10] The hearing officer also noted that "consider[ing] the length of time from the initial incident to the issuance of the NOV it is quite possible that Mr. Chopy did not see all the evidence pointing to [DOT's] involvement in this matter." The fact that an agency official might not review all the evidence before issuing a NOV is particularly troubling and indicative of the very type of governmental abuse the EAJA is intended to remedy.

In response to plaintiffs' background sample argument, DEM argues that it was reasonable to pursue an investigation and rely on those samples even though the samples were inadequate to support the NOV at the administrative hearing. To address the lack of background samples, DEM focuses much on the reasonableness of the site inspector's decision.

To support its contention that the allegation of oil pollution violations was justified, DEM notes that the record indicates the oil had been discharging for two or three days before DEM observed the release. This evidence, however, speaks only to the existence of the oil sheen and not to the knowledge of plaintiffs, which is a key factor in DEM's issuance of the violations for failure to immediately respond and report. *See* 250 R.I. Code R. § 130-00-1.10.

With respect to the NOV concerning these alleged violations of the Rhode Island State Water Pollution Act and DEM's Water Quality Regulations, we are of the opinion that DEM was not substantially justified in its actions leading up to the adjudicatory proceedings. As we have explained *supra*, DEM knew or should have known of DOT's involvement, and that DOT, not plaintiffs, should have been held responsible. As the hearing officer concluded: "The discharge

---

[10] The hearing officer summarized Chopy's testimony on this point as follows: "He said that they cited the [plaintiffs] because they are the property owners and presumably consented to the smaller [*sic*] pipe being installed. He said that Smithfield Peat and Smithfield Crushing Co., LLC don't own the property but Rollingwood Acres, Inc. does. He has no information to support that the [plaintiffs] consented to the installation of the pipe." The hearing officer found that plaintiffs had not given permission to DOT to alter the drainage structure and were not aware that DOT had changed the drainage structure until the alteration was completed.

[of silt] is due to the unauthorized changes made by [DOT]." DEM's omission was its failure to complete its investigation of DOT's culpability, notwithstanding its knowledge that DOT had routinely violated environmental laws and regulations. As a result, DEM resuscitated a long-defunct investigation against plaintiffs, and ultimately charged them with five alleged water quality violations for which they seemingly bore no responsibility.

In addition, those five alleged violations were based on water samples that were not taken in accordance with DEM's own water quality regulations. As the hearing officer found: "Without a valid upstream sample all of [DEM's] samples and testing on turbidity are meaningless." While we do not fault the site inspector's on-the-spot judgment call regarding where to take the water samples, nor would that alone tip the balance of our opinion on DEM's substantial justification, the lack of valid background samples is further evidence that DEM's position was "shaky from the start[.]" *Sierra Club v. Secretary of Army*, 820 F.2d 513, 520 (1st Cir. 1987).

Regarding the two oil pollution charges that DEM failed to prove by a preponderance of the evidence, we also conclude that DEM was not substantially justified. The charges alleged that plaintiffs failed to report the oil spill immediately and failed to begin containment and removal of the oil immediately. The evidence adduced at the hearing on the merits disclosed that the presence of a petroleum-based product was first discovered on the property by Naumann when he conducted his inspection on February 9, 2005. The record is devoid of any evidence that plaintiffs were aware of the contamination before that time. When notified of the problem, plaintiffs contacted Lincoln Environmental, which responded to the property "while Mr. Naumann was still conducting his initial investigation." Thus, DEM was fully aware that plaintiffs had acted promptly to contain the petroleum product, and it had no evidence that plaintiffs had any previous knowledge of the

oil discharge. We are satisfied that DEM has failed to show that it acted with substantial justification with respect to those two charges.

**V**

**Conclusion**

Although we have determined that DEM acted without substantial justification in pursuing various charges against the plaintiffs, we are mindful that it was another state agency, DOT, that made the changes to the plaintiffs' drainage system without the plaintiffs' knowledge or consent. DEM's responsibility stems from its failure to fully investigate the cause of the turbid water on the plaintiffs' property when it knew or should have known of DOT's involvement. It was DOT, however, that precipitated the sediment discharge by replacing the fifteen-inch-diameter pipe with the eighteen-inch-diameter pipe without the knowledge or consent of any of the plaintiffs and without obtaining a permit from DEM. As a result, the plaintiffs have been embroiled in a twenty-two-year saga somewhat reminiscent of the Hotel California ("You can check out any time you like / But you can never leave!").[11] In the words of the hearing officer, the plaintiffs were "victimized by [DOT]." We are convinced that this is the type of "unjust action[] by the state" that the EAJA was designed to ameliorate. Section 42-92-1(b).

Notwithstanding the hearing officer's ruling, as affirmed by the trial justice, that the plaintiffs are not entitled to reasonable litigation expenses, he nevertheless made findings of fact and conclusions of law on "the reasonability of the [plaintiffs'] litigation expenses to best present a complete record in the event the matter is appealed." Neither party takes issue with those findings and conclusions. Accordingly, we quash the judgment entered on October 9, 2015, and remand the record to the Superior Court with directions to enter a judgment in favor of the plaintiffs in the

---

[11] Don Felder, Glenn Frey, Don Henley, *Hotel California*, on Hotel California (Asylum Records 1976).

amount of $69,581.25 for attorneys' fees, and in the amount of $5,628.75 for the stenographic record. The trial justice, in her discretion, may also assess additional fees to compensate the plaintiffs for the appellate portion of this controversy.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Rollingwood Acres, Inc. et al. v. Rhode Island Department of Environmental Management et al. |
| **Case Number** | No. 2015-328-M.P.<br>(PC 14-1339) |
| **Date Opinion Filed** | June 24, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For Plaintiffs:<br><br>Joelle C. Rocha, Esq.<br>Michael A. Kelly, Esq. |
| | For Defendants:<br><br>Susan B. Forcier, Esq. |

SU-CMS-02A (revised June 2016)